(Slip Opinion)       OCTOBER  TERM,  2020       1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* ARTHREX, INC. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 19–1434.  Argued March 1, 2021—Decided June 21, 2021*

The question in these cases is whether the authority of Administrative Patent Judges (APJs) to issue decisions on behalf of the Executive Branch is consistent with the Appointments Clause of the Constitution.  APJs conduct adversarial proceedings for challenging the validity of an existing patent before the Patent Trial and Appeal Board (PTAB).  During such proceedings, the PTAB sits in panels of at least three of its members, who are predominantly APJs.  35 U. S. C. §§6(a), (c).  The Secretary of Commerce appoints all members of the PTAB—including 200-plus APJs—except for the Director, who is nominated by the President and confirmed by the Senate.  §§3(b)(1), (b)(2)(A), 6(a).  After Smith & Nephew, Inc., and ArthroCare Corp. (collectively, Smith & Nephew) petitioned for inter partes review of a patent secured by Arthrex, Inc., three APJs concluded that the patent was invalid.  On appeal to the Federal Circuit, Arthrex claimed that the structure of the PTAB violated the Appointments Clause, which specifies how the President may appoint officers to assist in carrying out his responsibilities.  Art. II, §2, cl. 2.  Arthrex argued that the APJs were principal officers who must be appointed by the President with the advice and consent of the Senate, and that their appointment by the Secretary of Commerce was therefore unconstitutional.  The Federal Circuit held that the APJs were principal officers whose appointments were unconstitutional because neither the Secretary nor Director can review their decisions or remove them at will.  To remedy this constitutional violation, the Federal Circuit invalidated the APJs' tenure protections,

——————

*Together with No. 19–1452, *Smith & Nephew, Inc., et al.* v. *Arthrex, Inc., et al.* and No. 19–1458, *Arthrex, Inc.* v. *Smith & Nephew, Inc., et al.*, also on certiorari to the same court.

making them removable at will by the Secretary.

*Held*: The judgment is vacated, and the case is remanded.

941 F. 3d 1320, vacated and remanded.

THE CHIEF JUSTICE delivered the opinion of the Court with respect to Parts I and II, concluding that the unreviewable authority wielded by APJs during inter partes review is incompatible with their appointment by the Secretary of Commerce to an inferior office. Pp. 6–19.

(a) The Appointments Clause provides that only the President, with the advice and consent of the Senate, can appoint principal officers. With respect to inferior officers, the Clause permits Congress to vest appointment power "in the President alone, in the Courts of Law, or in the Heads of Departments." Pp. 6–8.

(b) In *Edmond* v. *United States,* 520 U. S. 651, this Court explained that an inferior officer must be "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.*, at 663. Applying that test to Coast Guard Court of Criminal Appeals judges appointed by the Secretary of Transportation, the Court held that the judges were inferior officers because they were effectively supervised by a combination of Presidentially nominated and Senate confirmed officers in the Executive Branch. *Id.*, at 664–665. What the Court in *Edmond* found "significant" was that those judges had "no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Id.*, at 665.

Such review by a superior executive officer is absent here. While the Director has tools of administrative oversight, neither he nor any other superior executive officer can directly review decisions by APJs. Only the PTAB itself "may grant rehearings." §6(c). This restriction on review relieves the Director of responsibility for the final decisions rendered by APJs under his charge. Their decision—the final word within the Executive Branch—compels the Director to "issue and publish a certificate" canceling or confirming patent claims he had previously allowed. §318(b).

The Government and Smith & Nephew contend that the Director has various ways to indirectly influence the course of inter partes review. The Director, for example, could designate APJs predisposed to decide a case in his preferred manner. But such machinations blur the lines of accountability demanded by the Appointments Clause and leave the parties with neither an impartial decision by a panel of experts nor a transparent decision for which a politically accountable officer must take responsibility.

Even if the Director can refuse to designate APJs on *future* PTAB panels, he has no means of countermanding the final decision already on the books. Nor can the Secretary meaningfully control APJs

through the threat of removal from federal service entirely because she can fire them only "for such cause as will promote the efficiency of the service." 5 U. S. C. §7513(a); see *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. \_\_\_, \_\_\_. And the possibility of an appeal to the Federal Circuit does not provide the necessary supervision. APJs exercise executive power, and the President must be ultimately responsible for their actions. See *Arlington* v. *FCC*, 569 U. S. 290, 305, n. 4.

Given the insulation of PTAB decisions from any executive review, the President can neither oversee the PTAB himself nor "attribute the Board's failings to those whom he *can* oversee." *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.,* 561 U. S. 477, 496. APJs accordingly exercise power that conflicts with the design of the Appointments Clause "to preserve political accountability." *Edmond*, 520 U. S., at 663. Pp. 8–14.

(c) History reinforces the conclusion that the unreviewable executive power exercised by APJs is incompatible with their status as inferior officers. Founding-era congressional statutes and early decisions from this Court indicate that adequate supervision entails review of decisions issued by inferior officers. See, *e.g.*, 1 Stat. 66–67; *Barnard* v. *Ashley*, 18 How. 43, 45. Congress carried that model of principal officer review into the modern administrative state. See, *e.g.*, 5 U. S. C. §557(b).

According to the Government and Smith & Nephew, heads of department appoint a handful of contemporary officers who purportedly exercise final decisionmaking authority. Several of their examples, however, involve inferior officers whose decisions a superior executive officer can review or implement a system for reviewing. See, *e.g.*, *Freytag* v. *Commissioner*, 501 U. S. 868. Nor does the structure of the PTAB draw support from the predecessor Board of Appeals, which determined the patentability of inventions in panels composed of examiners-in-chief without an appeal to the Commissioner. 44 Stat. 1335–1336. Those Board decisions could be reviewed by the Court of Customs and Patent Appeals—an executive tribunal—and may also have been subject to the unilateral control of the agency head. Pp. 14–18.

(d) The Court does not attempt to "set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes." *Edmond*, 520 U. S., at 661. Many decisions by inferior officers do not bind the Executive Branch to exercise executive power in a particular manner, and the Court does not address supervision outside the context of adjudication. Here, however, Congress has assigned APJs "significant authority" in adjudicating the public rights of private parties, while also insulating their decisions from review and their offices from removal. *Buckley* v. *Valeo,* 424 U. S.

1, 126. Pp. 18–19.

THE CHIEF JUSTICE, joined by JUSTICE ALITO, JUSTICE KAVANAUGH, and JUSTICE BARRETT, concluded in Part III that §6(c) cannot constitutionally be enforced to the extent that its requirements prevent the Director from reviewing final decisions rendered by APJs. The Director accordingly may review final PTAB decisions and, upon review, may issue decisions himself on behalf of the Board. Section 6(c) otherwise remains operative as to the other members of the PTAB. When reviewing such a decision by the Director, a court must decide the case "conformably to the constitution, disregarding the law" placing restrictions on his review authority in violation of Article II. *Marbury* v. *Madison*, 1 Cranch 137, 178.

The appropriate remedy is a remand to the Acting Director to decide whether to rehear the petition filed by Smith & Nephew. A limited remand provides an adequate opportunity for review by a principal officer. Because the source of the constitutional violation is the restraint on the review authority of the Director, rather than the appointment of APJs by the Secretary, Arthrex is not entitled to a hearing before a new panel of APJs. Pp. 19–23.

ROBERTS, C. J., delivered the opinion of the Court with respect to Parts I and II, in which ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined, and an opinion with respect to Part III, in which ALITO, KAVANAUGH, and BARRETT, JJ., joined. GORSUCH, J., filed an opinion concurring in part and dissenting in part. BREYER, J., filed an opinion concurring in the judgment in part and dissenting in part, in which SOTOMAYOR and KAGAN, JJ., joined. THOMAS, J., filed a dissenting opinion, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined as to Parts I and II.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### Nos. 19–1434, 19–1452 and 19–1458

#### UNITED STATES, PETITIONER
19–1434          *v.*
#### ARTHREX, INC., ET AL.

#### SMITH & NEPHEW, INC., ET AL., PETITIONERS
19–1452          *v.*
#### ARTHREX, INC., ET AL.

#### ARTHREX, INC., PETITIONER
19–1458          *v.*
#### SMITH & NEPHEW, INC., ET AL.

#### ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

### [June 21, 2021]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court with respect to Parts I and II.

The validity of a patent previously issued by the Patent and Trademark Office can be challenged before the Patent Trial and Appeal Board, an executive tribunal within the PTO. The Board, composed largely of Administrative Patent Judges appointed by the Secretary of Commerce, has the final word within the Executive Branch on the validity of a challenged patent. Billions of dollars can turn on a Board decision.

Under the Constitution, "[t]he executive Power" is vested in the President, who has the responsibility to "take Care

that the Laws be faithfully executed." Art. II, §1, cl. 1; §3. The Appointments Clause provides that he may be assisted in carrying out that responsibility by officers nominated by him and confirmed by the Senate, as well as by other officers not appointed in that manner but whose work, we have held, must be directed and supervised by an officer who has been. §2, cl. 2. The question presented is whether the authority of the Board to issue decisions on behalf of the Executive Branch is consistent with these constitutional provisions.

## I
### A

The creation of a workable patent system was a congressional priority from the start. The First Congress established the Patent Board—consisting impressively of Secretary of State Thomas Jefferson, Secretary of War Henry Knox, and Attorney General Edmund Randolph—to issue patents for inventions they deemed "sufficiently useful and important." §1, 1 Stat. 109–110. Jefferson, a renowned inventor in his own right, "was charged with most of the responsibility" to administer the new patent system. Federico, Operation of the Patent Act of 1790, 18 J. Pat. Off. Soc. 237, 238–239 (1936). The Patent Board was a short-lived experiment because its members had much else to do. Jefferson candidly admitted that he had "been obliged to give undue & uninformed opinions on rights often valuable" without the "great deal of time" necessary to "understand & do justice by" patent applicants. Letter from T. Jefferson to H. Williamson (Apr. 1, 1792), in 6 Works of Thomas Jefferson 459 (P. Ford ed. 1904).

In 1793, Congress shifted to a registration system administered by the Secretary of State. See 1 Stat. 319–321. The Secretary no longer reviewed the substance of patent applications but instead issued patents through a routine process "as a ministerial officer." *Grant* v. *Raymond*, 6 Pet.

218, 241 (1832). The courts would make the initial determination of patent validity in a subsequent judicial proceeding, such as an infringement suit. See 1 Stat. 322. This scheme unsurprisingly resulted in the Executive Branch issuing many invalid patents and the Judicial Branch having to decide many infringement cases. See S. Doc. No. 338, 24th Cong., 1st Sess., 3 (1836). Judge William Van Ness—who before taking the bench had served as second to Aaron Burr in his duel with Alexander Hamilton—lamented that Congress had left the door "open and unguarded" for imposters to secure patents, with the consequences of "litigation and endless trouble, if not total ruin, to the true inventor." *Thompson* v. *Haight*, 23 F. Cas. 1040, 1041–1042 (No. 13,957) (CC SDNY 1826). Congress heeded such concerns by returning the initial determination of patentability to the Executive Branch, see 5 Stat. 117–118, where it remains today.

The present system is administered by the Patent and Trademark Office (PTO), an executive agency within the Department of Commerce "responsible for the granting and issuing of patents" in the name of the United States. 35 U. S. C. §§1(a), 2(a)(1). Congress has vested the "powers and duties" of the PTO in a sole Director appointed by the President with the advice and consent of the Senate. §3(a)(1). As agency head, the Director "provid[es] policy direction and management supervision" for PTO officers and employees. §3(a)(2)(A).

This suit centers on the Patent Trial and Appeal Board (PTAB), an executive adjudicatory body within the PTO established by the Leahy-Smith America Invents Act of 2011. 125 Stat. 313. The PTAB sits in panels of at least three members drawn from the Director, the Deputy Director, the Commissioner for Patents, the Commissioner for Trademarks, and more than 200 Administrative Patent Judges (APJs). 35 U. S. C. §§6(a), (c). The Secretary of Commerce appoints the members of the PTAB (except for the Director),

including the APJs at issue in this dispute. §§3(b)(1), (b)(2)(A), 6(a). Like the 1790 Patent Board, the modern Board decides whether an invention satisfies the standards for patentability on review of decisions by primary examiners. §§6(b)(1), 134(a).

Through a variety of procedures, the PTAB can also take a second look at patents previously issued by the PTO. §§6(b)(2)–(4). One such procedure is inter partes review. Established in 2011, inter partes review is an adversarial process by which members of the PTAB reconsider whether existing patents satisfy the novelty and nonobviousness requirements for inventions. See §6(a) of the America Invents Act, 125 Stat. 299. Any person—other than the patent owner himself—can file a petition to institute inter partes review of a patent. 35 U. S. C. §311(a). The Director can institute review only if, among other requirements, he determines that the petitioner is reasonably likely to prevail on at least one challenged patent claim. §314(a). Congress has committed the decision to institute inter partes review to the Director's unreviewable discretion. See *Thryv, Inc.* v. *Click-To-Call Technologies, LP*, 590 U. S. ___, ___ (2020) (slip op., at 6). By regulation, the Director has delegated this authority to the PTAB itself. 37 CFR §42.4(a) (2020).

The Director designates at least three members of the PTAB (typically three APJs) to conduct an inter partes proceeding. 35 U. S. C. §6(c). The PTAB then assumes control of the process, which resembles civil litigation in many respects. §316(c). The PTAB must issue a final written decision on all of the challenged patent claims within 12 to 18 months of institution. §316(a)(11); see *SAS Institute Inc.* v. *Iancu*, 584 U. S. ___, ___ (2018) (slip op., at 5). A party who disagrees with a decision may request rehearing by the PTAB. 35 U. S. C. §6(c); 37 CFR §42.71(d).

The PTAB is the last stop for review within the Executive Branch. A party dissatisfied with the final decision may seek judicial review in the Court of Appeals for the Federal

Circuit. 35 U. S. C. §319. At this stage, the Director can intervene before the court to defend or disavow the Board's decision. §143. The Federal Circuit reviews the PTAB's application of patentability standards *de novo* and its underlying factual determinations for substantial evidence. See *Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 4). Upon expiration of the time to appeal or termination of any appeal, "the Director shall issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent by operation of the certificate any new or amended claim determined to be patentable." §318(b).

B

Arthrex, Inc. develops medical devices and procedures for orthopedic surgery. In 2015, it secured a patent on a surgical device for reattaching soft tissue to bone without tying a knot, U. S. Patent No. 9,179,907 ('907 patent). Arthrex soon claimed that Smith & Nephew, Inc. and ArthroCare Corp. (collectively, Smith & Nephew) had infringed the '907 patent, and the dispute eventually made its way to inter partes review in the PTO. Three APJs formed the PTAB panel that conducted the proceeding and ultimately concluded that a prior patent application "anticipated" the invention claimed by the '907 patent, so that Arthrex's patent was invalid. See App. to Pet. for Cert. in No. 19–1434, p. 128a.

On appeal to the Federal Circuit, Arthrex raised for the first time an argument premised on the Appointments Clause of the Constitution. That Clause specifies how the President may appoint officers who assist him in carrying out his responsibilities. *Principal* officers must be appointed by the President with the advice and consent of the Senate, while *inferior* officers may be appointed by the

President alone, the head of an executive department, or a court. Art. II, §2, cl. 2. Arthrex argued that the APJs were principal officers and therefore that their appointment by the Secretary of Commerce was unconstitutional. The Government intervened to defend the appointment procedure.

The Federal Circuit agreed with Arthrex that APJs were principal officers. 941 F. 3d 1320, 1335 (2019). Neither the Secretary nor Director had the authority to review their decisions or to remove them at will. The Federal Circuit held that these restrictions meant that APJs were themselves principal officers, not inferior officers under the direction of the Secretary or Director.

To fix this constitutional violation, the Federal Circuit invalidated the tenure protections for APJs. Making APJs removable at will by the Secretary, the panel held, prospectively "renders them inferior rather than principal officers." *Id.*, at 1338. The Federal Circuit vacated the PTAB's decision and remanded for a fresh hearing before a new panel of APJs, who would no longer enjoy protection against removal. *Id.*, at 1338–1340.

This satisfied no one. The Government, Smith & Nephew, and Arthrex each requested rehearing en banc, which the Court of Appeals denied. 953 F. 3d 760, 761 (2020) (*per curiam*). The parties then requested review of different aspects of the panel's decision in three petitions for certiorari.

We granted those petitions to consider whether the PTAB's structure is consistent with the Appointments Clause, and the appropriate remedy if it is not. 592 U. S. ___ (2020).

## II

### A

The President is "'responsible for the actions of the Executive Branch'" and "'cannot delegate [that] ultimate responsibility or the active obligation to supervise that goes

with it.'" *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 496–497 (2010) (quoting *Clinton* v. *Jones*, 520 U. S. 681, 712–713 (1997) (BREYER, J., concurring in judgment)). The Framers recognized, of course, that "no single person could fulfill that responsibility alone, [and] expected that the President would rely on subordinate officers for assistance." *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. \_\_\_, \_\_\_ (2020) (plurality opinion) (slip op., at 2).

Today, thousands of officers wield executive power on behalf of the President in the name of the United States. That power acquires its legitimacy and accountability to the public through "a clear and effective chain of command" down from the President, on whom all the people vote. *Free Enterprise Fund*, 561 U. S., at 498. James Madison extolled this "great principle of unity and responsibility in the Executive department," which ensures that "the chain of dependence [will] be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community." 1 Annals of Cong. 499 (1789).

The Appointments Clause provides:

> "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." Art. II, §2, cl. 2.

Assigning the nomination power to the President guarantees accountability for the appointees' actions because the "blame of a bad nomination would fall upon the president

singly and absolutely." The Federalist No. 77, p. 517 (J. Cooke ed. 1961) (A. Hamilton). As Hamilton wrote, the "sole and undivided responsibility of one man will naturally beget a livelier sense of duty and a more exact regard to reputation." *Id.*, No. 76, at 510–511. The Appointments Clause adds a degree of accountability in the Senate, which shares in the public blame "for both the making of a bad appointment and the rejection of a good one." *Edmond* v. *United States*, 520 U. S. 651, 660 (1997).

Only the President, with the advice and consent of the Senate, can appoint noninferior officers, called "principal" officers as shorthand in our cases. See *id.*, at 659. The "default manner of appointment" for inferior officers is also nomination by the President and confirmation by the Senate. *Id.*, at 660. But the Framers foresaw that "when offices became numerous, and sudden removals necessary, this mode might be inconvenient." *United States* v. *Germaine*, 99 U. S. 508, 510 (1879). Reflecting this concern for "administrative convenience," the Appointments Clause permits Congress to dispense with joint appointment, but only for inferior officers. *Edmond*, 520 U. S., at 660. Congress may vest the appointment of such officers "in the President alone, in the Courts of Law, or in the Heads of Departments."

B

Congress provided that APJs would be appointed as inferior officers, by the Secretary of Commerce as head of a department. The question presented is whether the nature of their responsibilities is consistent with their method of appointment. As an initial matter, no party disputes that APJs are officers—not "lesser functionaries" such as employees or contractors—because they "exercis[e] significant authority pursuant to the laws of the United States." *Buckley* v. *Valeo*, 424 U. S. 1, 126, and n. 162 (1976) (*per curiam*); see *Lucia* v. *SEC*, 585 U. S. ___, ___–___ (2018) (slip op., at

8–9). APJs do so when reconsidering an issued patent, a power that (the Court has held) involves the adjudication of public rights that Congress may appropriately assign to executive officers rather than to the Judiciary. See *Oil States*, 584 U. S., at \_\_\_–\_\_\_ (slip op., at 8–9).

The starting point for each party's analysis is our opinion in *Edmond.* There we explained that "[w]hether one is an 'inferior' officer depends on whether he has a superior" other than the President. 520 U. S., at 662. An inferior officer must be "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.*, at 663.

In *Edmond*, we applied this test to adjudicative officials within the Executive Branch—specifically, Coast Guard Court of Criminal Appeals judges appointed by the Secretary of Transportation. See *id.*, at 658. We held that the judges were inferior officers because they were effectively supervised by a combination of Presidentially nominated and Senate confirmed officers in the Executive Branch: first, the Judge Advocate General, who "exercise[d] administrative oversight over the Court of Criminal Appeals" by prescribing rules of procedure and formulating policies for court-martial cases, and could also "remove a Court of Criminal Appeals judge from his judicial assignment without cause"; and second, the Court of Appeals for the Armed Forces, an executive tribunal that could review the judges' decisions under a *de novo* standard for legal issues and a deferential standard for factual issues. *Id.*, at 664–665. "What is significant," we concluded, "is that the judges of the Court of Criminal Appeals have no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Id.*, at 665.

Congress structured the PTAB differently, providing only half of the "divided" supervision to which judges of the Court of Criminal Appeals were subject. *Id.*, at 664. Like the Judge Advocate General, the PTO Director possesses

powers of "administrative oversight." *Ibid.* The Director fixes the rate of pay for APJs, controls the decision whether to institute inter partes review, and selects the APJs to reconsider the validity of the patent. 35 U. S. C. §§3(b)(6), 6(c), 314(a). The Director also promulgates regulations governing inter partes review, issues prospective guidance on patentability issues, and designates past PTAB decisions as "precedential" for future panels. §§3(a)(2)(A), 316(a)(4); Brief for United States 6. He is the boss, except when it comes to the one thing that makes the APJs officers exercising "significant authority" in the first place—their power to issue decisions on patentability. *Buckley*, 424 U. S., at 126. In contrast to the scheme approved by *Edmond*, no principal officer at any level within the Executive Branch "direct[s] and supervise[s]" the work of APJs in that regard. 520 U. S., at 663.

*Edmond* goes a long way toward resolving this dispute. What was "significant" to the outcome there—review by a superior executive officer—is absent here: APJs have the "power to render a final decision on behalf of the United States" without any such review by their nominal superior or any other principal officer in the Executive Branch. *Id.*, at 665. The only possibility of review is a petition for rehearing, but Congress unambiguously specified that "[o]nly the Patent and Trial Appeal Board may grant rehearings." §6(c). Such review simply repeats the arrangement challenged as unconstitutional in this suit.

This "diffusion of power carries with it a diffusion of accountability." *Free Enterprise Fund*, 561 U. S., at 497. The restrictions on review relieve the Director of responsibility for the final decisions rendered by APJs purportedly under his charge. The principal dissent's observation that "the Director alone has the power to take final action to cancel a patent claim or confirm it," *post*, at 7 (opinion of THOMAS, J.), simply ignores the undisputed fact that the Director's

"power" in that regard is limited to carrying out the ministerial duty that he "shall issue and publish a certificate" canceling or confirming patent claims he had previously allowed, as dictated by the APJs' final decision. §318(b); see §§131, 153. The chain of command runs not from the Director to his subordinates, but from the APJs to the Director.

The Government and Smith & Nephew assemble a catalog of steps the Director might take to affect the decisionmaking process of the PTAB, despite his lack of any statutory authority to review its decisions. See Brief for United States 30–32; Brief for Smith & Nephew, Inc., et al. 25–27. The Government reminds us that it is the Director who decides whether to initiate inter partes review. §314(a). The Director can also designate the APJs who will decide a particular case and can pick ones predisposed to his views. §6(c). And the Director, the Government asserts, can even vacate his institution decision if he catches wind of an unfavorable ruling on the way. The "proceeding will have no legal consequences" so long as the Director jumps in before the Board issues its final decision. Brief for United States 31.

If all else fails, the Government says, the Director can intervene in the rehearing process to reverse Board decisions. The Government acknowledges that only the PTAB can grant rehearing under §6(c). But the Director, according to the Government, could manipulate the composition of the PTAB panel that acts on the rehearing petition. For one thing, he could "stack" the original panel to rehear the case with additional APJs assumed to be more amenable to his preferences. See *Oil States*, 584 U. S., at \_\_\_ (GORSUCH, J., dissenting) (slip op., at 3). For another, he could assemble an entirely new panel consisting of himself and two other officers appointed by the Secretary—in practice, the Commissioner for Patents and the APJ presently designated as Chief Judge—to decide whether to overturn a decision and reach a different outcome binding on future panels. See

Brief for United States 6–7, 31–32.  The Government insists that the Director, by handpicking (and, if necessary, re-picking) Board members, can indirectly influence the course of inter partes review.

That is not the solution.  It is the problem.  The Government proposes (and the dissents embrace) a roadmap for the Director to evade a statutory prohibition on review without having him take responsibility for the ultimate de-cision.  See *post*, at 2–3 (BREYER, J., concurring in judgment in part and dissenting in part); *post*, at 8–10 (opinion of THOMAS, J.).  Even if the Director succeeds in procuring his preferred outcome, such machinations blur the lines of ac-countability demanded by the Appointments Clause.  The parties are left with neither an impartial decision by a panel of experts nor a transparent decision for which a po-litically accountable officer must take responsibility.  And the public can only wonder "on whom the blame or the pun-ishment of a pernicious measure, or series of pernicious measures ought really to fall."  The Federalist No. 70, at 476 (A. Hamilton).

The Government contends that the Director may respond after the fact by removing an APJ "from his judicial assign-ment without cause" and refusing to designate that APJ on *future* PTAB panels.  *Edmond*, 520 U. S., at 664.  Even as-suming that is true, reassigning an APJ to a different task going forward gives the Director no means of countermand-ing the final decision already on the books.  Nor are APJs "meaningfully controlled" by the threat of removal from fed-eral service entirely, *Seila Law*, 591 U. S., at ___ (slip op., at 23), because the Secretary can fire them after a decision only "for such cause as will promote the efficiency of the service," 5 U. S. C. §7513(a).  In all the ways that matter to the parties who appear before the PTAB, the buck stops with the APJs, not with the Secretary or Director.

Review outside Article II—here, an appeal to the Federal Circuit—cannot provide the necessary supervision.  While

the duties of APJs "partake of a Judiciary quality as well as Executive," APJs are still exercising executive power and must remain "dependent upon the President." 1 Annals of Cong., at 611–612 (J. Madison); see *Oil States*, 584 U. S., at \_\_\_ (slip op., at 8). The activities of executive officers may "take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they *must be* exercises of—the 'executive Power,'" for which the President is ultimately responsible. *Arlington* v. *FCC*, 569 U. S. 290, 305, n. 4 (2013) (quoting Art. II, §1, cl. 1).

Given the insulation of PTAB decisions from any executive review, the President can neither oversee the PTAB himself nor "attribute the Board's failings to those whom he *can* oversee." *Free Enterprise Fund*, 561 U. S., at 496. APJs accordingly exercise power that conflicts with the design of the Appointments Clause "to preserve political accountability." *Edmond*, 520 U. S., at 663.

The principal dissent dutifully undertakes to apply the governing test from *Edmond*, see *post*, at 5–10 (opinion of THOMAS, J.), but its heart is plainly not in it. For example, the dissent rejects any distinction between "inferior-officer power" and "principal-officer power," *post*, at 12, but *Edmond* calls for exactly that: an appraisal of how much power an officer exercises free from control by a superior. The dissent pigeonholes this consideration as the sole province of the Vesting Clause, *post*, at 14–15, but *Edmond* recognized the Appointments Clause as a "significant structural safeguard[ ]" that "preserve[s] political accountability" through direction and supervision of subordinates—in other words, through a chain of command. 520 U. S., at 659, 663. The dissent would have the Court focus on the location of an officer in the agency "organizational chart," *post*, at 1, but as we explained in *Edmond*, "[i]t is not enough that other officers may be identified who formally maintain a higher rank, or possess responsibilities of a greater magnitude," 520 U. S., at 662–663. The dissent stresses that "at least

two levels of authority" separate the President from PTAB decisions, *post*, at 1, but the unchecked exercise of executive power by an officer buried many layers beneath the President poses more, not less, of a constitutional problem. Conspicuously absent from the dissent is any concern for the President's ability to "discharge his own constitutional duty of seeing that the laws be faithfully executed." *Myers* v. *United States*, 272 U. S. 52, 135 (1926).

The other dissent charges that the Court's opinion has "no foundation" in past decisions. *Post*, at 5 (opinion of BREYER, J.). Of course, we have a different view on the proper application of *Edmond* in this dispute. As for other past decisions, it is the dissent that expressly grounds its analysis in dissenting opinions from *Free Enterprise Fund* and *Seila Law*, while frankly acknowledging that the *Court's* opinions in those cases support the principles that guide us here. *Post*, at 5–7.

C

History reinforces the conclusion that the unreviewable executive power exercised by APJs is incompatible with their status as inferior officers. Since the founding, principal officers have directed the decisions of inferior officers on matters of law as well as policy. Hamilton articulated the principle of constitutional accountability underlying such supervision in a 1792 Treasury circular. Writing as Secretary of the Treasury to the customs officials under his charge, he warned that any deviations from his instructions "would be subversive of uniformity in the execution of the laws." 3 Works of Alexander Hamilton 557 (J. Hamilton ed. 1850). "The power to superintend," he explained, "must imply a right to judge and direct," thereby ensuring that "the responsibility for a wrong construction rests with the head of the department, when it proceeds from him." *Id.*, at 559.

Early congressional statutes expressly empowered department heads to supervise the work of their subordinates,

sometimes by providing for an appeal in adjudicatory proceedings to a Presidentially nominated and Senate confirmed officer. See, *e.g.*, 1 Stat. 66–67 (authorizing appeal of auditor decisions to Comptroller); §4, 1 Stat. 378 (permitting supervisors of the revenue to issue liquor licenses "subject to the superintendence, control and direction of the department of the treasury"). For the most part, Congress left the structure of administrative adjudication up to agency heads, who prescribed internal procedures (and thus exercised direction and control) as they saw fit. See J. Mashaw, Creating the Administrative Constitution 254 (2012).

This Court likewise indicated in early decisions that adequate supervision entails review of decisions issued by inferior officers. For example, we held that the Commissioner of the General Land Office—the erstwhile agency that adjudicated private claims to public lands and granted land patents—could review decisions of his subordinates despite congressional silence on the matter. Our explanation, almost "too manifest to require comment," was that the authority to review flowed from the "necessity of 'supervision and control,' vested in the commissioner, acting under the direction of the President." *Barnard* v. *Ashley*, 18 How. 43, 45 (1856). "Of necessity," we later elaborated, the Commissioner "must have power to adjudge the question of accuracy preliminary to the issue of a [land] patent." *Magwire* v. *Tyler*, 1 Black 195, 202 (1862).

Congress has carried the model of principal officer review into the modern administrative state. As the Government forthrightly acknowledged at oral argument, it "certainly is the norm" for principal officers to have the capacity to review decisions made by inferior adjudicative officers. Tr. of Oral Arg. 23. The Administrative Procedure Act, from its inception, authorized agency heads to review such decisions. 5 U. S. C. §557(b). And "higher-level agency reconsideration" by the agency head is the standard way to maintain political accountability and effective oversight for

adjudication that takes place outside the confines of §557(b). Walker & Wasserman, The New World of Agency Adjudication, 107 Cal. L. Rev. 141, 157 (2019). To take one example recently discussed by this Court in *Free Enterprise Fund*, the Public Company Accounting Oversight Board can issue sanctions in disciplinary proceedings, but such sanctions are reviewable by its superior, the Securities and Exchange Commission. 15 U. S. C. §§7215(c)(4), 7217(c).

The Government and Smith & Nephew point to a handful of contemporary officers who are appointed by heads of departments but who nevertheless purportedly exercise final decisionmaking authority. Several examples, however, involve inferior officers whose decisions a superior executive officer can review or implement a system for reviewing. For instance, the special trial judges in *Freytag* v. *Commissioner*, 501 U. S. 868 (1991), may enter a decision on behalf of the Tax Court—whose members are nominated by the President and confirmed by the Senate, 26 U. S. C. §7443(b)—but only "subject to such conditions and review as the court may provide." §7443A(c); see also 8 CFR §1003.0(a) (2020) (establishing Executive Office for Immigration Review under control of Attorney General). And while the Board of Veteran Affairs does make the final decision within the Department of Veteran Affairs, 38 U. S. C. §§7101, 7104(a), its decisions are reviewed by the Court of Appeals for Veterans Claims, an Executive Branch entity, §§7251, 7252(a). See *Henderson* v. *Shinseki*, 562 U. S. 428, 431–432 (2011). Other examples are potentially distinguishable, such as the Benefits Review Board members who appear to serve at the pleasure of the appointing department head. See 33 U. S. C. §921(c); *Kalaris* v. *Donovan*, 697 F. 2d 376, 396–397 (CADC 1983).

Perhaps the Civilian and Postal Boards of Contract Appeals are most similar to the PTAB. The Administrator of General Services and the Postmaster General appoint the

members of the respective Boards, whose decisions are appealable to the Federal Circuit. See 41 U. S. C. §§7105(b), (d), (e), 7107(a). Congress established both entities in 2006 and gave them jurisdiction over disputes involving public contractors. 119 Stat. 3391–3394. Whatever distinct issues that scheme might present, the Boards of Contract Appeals—both young entrants to the regulatory landscape—provide the PTAB no "foothold in history or tradition" across the Executive Branch. *Seila Law*, 591 U. S., at \_\_\_ (slip op., at 21).

When it comes to the patent system in particular, adjudication has followed the traditional rule that a principal officer, if not the President himself, makes the final decision on how to exercise executive power. Recall that officers in President Washington's Cabinet formed the first Patent Board in 1790. 1 Stat. 109–110. The initial determination of patentability was then relegated to the courts in 1793, but when the Executive Branch reassumed authority in 1836, it was the Commissioner of Patents—appointed by the President with the advice and consent of the Senate—who exercised control over the issuance of a patent. 5 Stat. 117, 119. The patent system, for nearly the next hundred years, remained accountable to the President through the Commissioner, who directed the work of his subordinates by, for example, hearing appeals from decisions by examiners-in-chief, the forebears of today's APJs. 12 Stat. 246–247.

The Government and Smith & Nephew find support for the structure of the PTAB in the predecessor Board of Appeals established in 1927. 44 Stat. 1335–1336. Simplified somewhat, the Board of Appeals decided the patentability of inventions in panels composed of examiners-in-chief without an appeal to the Commissioner. But decisions by examiners-in-chief could be reviewed by the Court of Customs and Patent Appeals (CCPA), an entity within the Ex-

ecutive Branch until 1958. 45 Stat. 1476; see *Ex parte Bakelite Corp.*, 279 U. S. 438, 460 (1929); see also 72 Stat. 848. The President appointed CCPA judges with the advice and consent of the Senate. 36 Stat. 105. Even after 1958, the Commissioner appears to have retained "the ultimate authority regarding the granting of patents" through the examination and interference processes, notwithstanding the lack of a formal appeal from the Board's decision. *In re Alappat*, 33 F. 3d 1526, 1535 (CA Fed. 1994) (en banc) (plurality opinion). The history of the Board of Appeals, though more winding and varied than recounted here, has little to say about the present provision expressly ordering the Director to undo his prior patentability determination when a PTAB panel of unaccountable APJs later disagrees with it. See 35 U. S. C. §318(b).

The Government and Smith & Nephew also note that early Patent Acts authorized the Secretary of State to appoint two types of officials who made final decisions on questions of patent law. See 1 Stat. 322–323 (panel of arbitrators in interference proceedings); 5 Stat. 120–121 (board of examiners to hear appeal from patentability or priority decision of Commissioner). Neither example, however, serves as historical precedent for modern APJs. Both the arbitrators and the examiners assembled to resolve a single issue—indeed, these ad hoc positions may not have even constituted offices. See *Auffmordt* v. *Hedden*, 137 U. S. 310, 327 (1890). If they were officers, they exercised their limited power under "special and temporary conditions." *United States* v. *Eaton*, 169 U. S. 331, 343 (1898) (holding that an inferior officer can perform functions of principal office on acting basis). APJs, by contrast, occupy a permanent office unless removed by the Secretary for cause.

\* \* \*

We hold that the unreviewable authority wielded by APJs

during inter partes review is incompatible with their appointment by the Secretary to an inferior office. The principal dissent repeatedly charges that we never say whether APJs are principal officers who were not appointed in the manner required by the Appointments Clause, or instead inferior officers exceeding the permissible scope of their duties under that Clause. See *post*, at 3, 11, 16 (opinion of THOMAS, J.). But both formulations describe the same constitutional violation: Only an officer properly appointed to a principal office may issue a final decision binding the Executive Branch in the proceeding before us.

In reaching this conclusion, we do not attempt to "set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes." *Edmond*, 520 U. S., at 661. Many decisions by inferior officers do not bind the Executive Branch to exercise executive power in a particular manner, and we do not address supervision outside the context of adjudication. Cf. *post*, at 13–14 (opinion of THOMAS, J.). Here, however, Congress has assigned APJs "significant authority" in adjudicating the public rights of private parties, while also insulating their decisions from review and their offices from removal. *Buckley*, 424 U. S., at 126.

## III

We turn now to the appropriate way to resolve this dispute given this violation of the Appointments Clause. In general, "when confronting a constitutional flaw in a statute, we try to limit the solution to the problem" by disregarding the "problematic portions while leaving the remainder intact." *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 328–329 (2006). This approach derives from the Judiciary's "negative power to disregard an unconstitutional enactment" in resolving a legal dispute. *Massachusetts* v. *Mellon*, 262 U. S. 447, 488 (1923). In a case that presents a conflict between the Constitution and

a statute, we give "full effect" to the Constitution and to whatever portions of the statute are "not repugnant" to the Constitution, effectively severing the unconstitutional portion of the statute. *Bank of Hamilton* v. *Lessee of Dudley*, 2 Pet. 492, 526 (1829) (Marshall, C. J.). This principle explains our "normal rule that partial, rather than facial, invalidation is the required course." *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 504 (1985).

Arthrex asks us to hold the entire regime of inter partes review unconstitutional. In its view, any more tailored declaration of unconstitutionality would necessitate a policy decision best left to Congress in the first instance. Because the good cannot be separated from the bad, Arthrex continues, the appropriate remedy is to order outright dismissal of the proceeding below. The partial dissent, similarly forswearing the need to do anything beyond "identifying the constitutional violation," would grant full relief to Arthrex. *Post*, at 5–6 (GORSUCH, J., concurring in part and dissenting in part).

In our view, however, the structure of the PTO and the governing constitutional principles chart a clear course: Decisions by APJs must be subject to review by the Director. Congress vested the Director with the "powers and duties" of the PTO, 35 U. S. C. §3(a)(1), tasked him with supervising APJs, §3(a)(2)(A), and placed the PTAB "in" the PTO, §6(a). A single officer has superintended the activities of the PTO since the Commissioner of Patents assumed the role of "chief officer" of the Patent Office in 1836. §1, 5 Stat. 117–118. The Commissioner long oversaw examiners-in-chief, see 12 Stat. 246–247, just as the Director today has the responsibility to oversee APJs. While shielding the ultimate decisions of the 200-plus APJs from review, Congress also provided the Director means of control over the institution and conduct of inter partes review. 35 U. S. C. §§314(a), 316(a). In every respect save the insulation of their decisions from review within the Executive Branch,

APJs appear to be inferior officers—an understanding consistent with their appointment in a manner permissible for inferior but not principal officers.

The America Invents Act insulates APJs from supervision through two mechanisms. The statute provides that "each . . . inter partes review shall be heard by at least 3 members of the [PTAB]" and that "only the [PTAB] may grant rehearings." §6(c). The upshot is that the Director cannot rehear and reverse a final decision issued by APJs. If the Director were to have the "authority to take control" of a PTAB proceeding, APJs would properly function as inferior officers. *Go-Bart Importing Co.* v. *United States*, 282 U. S. 344, 354 (1931).

We conclude that a tailored approach is the appropriate one: Section 6(c) cannot constitutionally be enforced to the extent that its requirements prevent the Director from reviewing final decisions rendered by APJs. Because Congress has vested the Director with the "power and duties" of the PTO, §3(a)(1), the Director has the authority to provide for a means of reviewing PTAB decisions. See also §§3(a)(2)(A), 316(a)(4). The Director accordingly may review final PTAB decisions and, upon review, may issue decisions himself on behalf of the Board. Section 6(c) otherwise remains operative as to the other members of the PTAB.

This does not result in an incomplete or unworkable statutory scheme. Cf. *United States* v. *Treasury Employees*, 513 U. S. 454, 479 (1995). To the contrary, review by the Director would follow the almost-universal model of adjudication in the Executive Branch, see *supra*, at 15–16, and aligns the PTAB with the *other* adjudicative body in the PTO, the Trademark Trial and Appeal Board, see §228 of the Trademark Modernization Act of 2020, 134 Stat. 2209.

The Government defends the different approach adopted by the Federal Circuit. The Court of Appeals held unenforceable APJs' protection against removal except "for such

cause as will promote the efficiency of the service," 5
U. S. C. §7513(a), which applies through 35 U. S. C. §3(c).
See 941 F. 3d, at 1337, 1340. If the for-cause provision were
unenforceable, the Secretary could remove APJs at will.
See *Ex parte Hennen*, 13 Pet. 230, 259–260 (1839). The
Government contends that APJs would then be inferior of-
ficers under *Free Enterprise Fund*. But regardless whether
the Government is correct that at-will removal by the Sec-
retary would cure the constitutional problem, review by the
Director better reflects the structure of supervision within
the PTO and the nature of APJs' duties, for the reasons we
have explained. See *supra*, at 12, 20–21.

In sum, we hold that 35 U. S. C. §6(c) is unenforceable as
applied to the Director insofar as it prevents the Director
from reviewing the decisions of the PTAB on his own. The
Director may engage in such review and reach his own de-
cision. When reviewing such a decision by the Director, a
court must decide the case "conformably to the constitution,
disregarding the law" placing restrictions on his review au-
thority in violation of Article II. *Marbury* v. *Madison*, 1
Cranch 137, 178 (1803). We add that this suit concerns only
the Director's ability to supervise APJs in adjudicating pe-
titions for inter partes review. We do not address the Di-
rector's supervision over other types of adjudications con-
ducted by the PTAB, such as the examination process for
which the Director has claimed unilateral authority to issue
a patent. See Reply Brief for Arthrex, Inc. 6.

We also conclude that the appropriate remedy is a re-
mand to the Acting Director for him to decide whether to
rehear the petition filed by Smith & Nephew. Although the
APJs' appointment by the Secretary allowed them to law-
fully adjudicate the petition in the first instance, see *Frey-
tag*, 501 U. S., at 881–882, they lacked the power under the
Constitution to finally resolve the matter within the Exec-
utive Branch. Under these circumstances, a limited re-
mand to the Director provides an adequate opportunity for

review by a principal officer.  Because the source of the constitutional violation is the restraint on the review authority of the Director, rather than the appointment of APJs by the Secretary, Arthrex is not entitled to a hearing before a new panel of APJs.  Cf. *Lucia*, 585 U. S., at \_\_\_–\_\_\_ (slip op., at 12–13).

\*　　\*　　\*

Today, we reaffirm and apply the rule from *Edmond* that the exercise of executive power by inferior officers must at some level be subject to the direction and supervision of an officer nominated by the President and confirmed by the Senate.  The Constitution therefore forbids the enforcement of statutory restrictions on the Director that insulate the decisions of APJs from his direction and supervision.  To be clear, the Director need not review every decision of the PTAB.  What matters is that the Director have the discretion to review decisions rendered by APJs.  In this way, the President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people.

The judgment of the United States Court of Appeals for the Federal Circuit is vacated, and the cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

Nos. 19–1434, 19–1452 and 19–1458

---

UNITED STATES, PETITIONER
19–1434          *v.*
ARTHREX, INC., ET AL.


SMITH & NEPHEW, INC., ET AL., PETITIONERS
19–1452          *v.*
ARTHREX, INC., ET AL.


ARTHREX, INC., PETITIONER
19–1458          *v.*
SMITH & NEPHEW, INC., ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[June 21, 2021]

JUSTICE GORSUCH, concurring in part and dissenting in part.

For most of this Nation's history, an issued patent was considered a vested property right that could be taken from an individual only through a lawful process before a court. *Oil States Energy Services*, *LLC* v. *Greene's Energy Group*, *LLC*, 584 U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (GORSUCH, J., dissenting) (slip op., at 8–10). I continue to think this Court's recent decision in *Oil States*—upsetting this traditional understanding and allowing officials in the Executive Branch to "cancel" already-issued patents—departed from the Constitution's separation of powers. But it would be an even greater departure to permit those officials to withdraw a vested property right while accountable to no one within the Executive Branch. Accordingly, I join Parts I and II of the

Court's opinion. Respectfully, however, I am unable join the Court's severability discussion in Part III.

\*

On the merits, I agree with the Court that Article II vests the "executive Power" in the President alone. This admittedly formal rule serves a vital function. If the executive power is exercised poorly, the Constitution's design at least ensures "[t]he people know whom to blame"—and hold accountable. *Morrison* v. *Olson*, 487 U. S. 654, 729 (1988) (Scalia, J., dissenting). As Hamilton explained, the President's "due dependence on the people and . . . due responsibility" to them are key "ingredients which constitute safety in the republican sense." The Federalist No. 70, p. 424 (C. Rossiter ed. 1961). Or as Madison put it, "no principle is more clearly laid down in the Constitution than that of responsibility." 1 Annals of Cong. 462 (1789). Without presidential responsibility there can be no democratic accountability for executive action.

Of course, the framers recognized that no one alone can discharge all the executive duties of the federal government. They "expected that the President would rely on subordinate officers for assistance." *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. ___, ___ (2020) (ROBERTS, C. J.) (slip op., at 2). But the framers took pains to ensure those subordinates would always remain responsible to the President and thus, ultimately, to the people. Because it is the President's duty to take care that the laws be faithfully executed, Art. II, §3, the framers sought to ensure he possessed "the power of *appointing, overseeing, and controlling* those who execute the laws." 1 Annals of Cong. 463 (Madison) (emphasis added).

To this end, the Constitution provided for a chain of authority. Several constitutional provisions reflect this structure. See Calabresi & Prakash, The President's Power To

Execute the Laws, 104 Yale L. J. 541, 570–599 (1994); Lawson, Appointments and Illegal Adjudication: The American Invents Act Through a Constitutional Lens, 26 Geo. Mason L. Rev. 26, 57–58 (2018). The Appointments Clause, for example, vests the President with the power to appoint "Officers of the United States" with "the Advice and Consent of the Senate," and to appoint "inferior Officers . . . alone" when Congress authorizes him to do so. Art. II, §2, cl. 2.

By definition, an "'inferior officer' . . . has a superior." *Edmond* v. *United States*, 520 U. S. 651, 662 (1997). To be an "inferior" officer, then, one must be both "*subordinate* to a[n] officer in the Executive Branch" and "under the direct control of the President" through a "chain of command." *Morrison*, 487 U. S., at 720–721 (Scalia, J., dissenting). In this way, the "text and structure of the Appointments Clause" *require* a "reference to hierarchy." Calabresi & Lawson, The Unitary Executive, Jurisdiction Stripping, and the *Hamdan* Opinions: A Textualist Response to Justice Scalia, 107 Colum. L. Rev. 1002, 1018–1020 (2007). Only such an understanding preserves, as Madison described it, the "chain of dependence," where "the lowest officers, the middle grade, and the highest"—each and every one—"will depend, as they ought, on the President." 1 Annals of Cong. 499 (Madison). And where the President, in turn, depends "on the community," so that "[t]he chain of dependence" finally "terminates in the supreme body, namely, in the people." *Ibid.*

I agree with the Court, too, that the statutory regime before us breaks this chain of dependence. In the America Invents Act of 2011 (AIA), Congress authorized the inter partes review (IPR) process, which permits anyone to file a petition asking the Patent and Trademark Office to "cancel" someone else's patent. 35 U. S. C. §311. Congress assigned the power to decide an IPR proceeding to a specific group of officials—the Patent Trial and Appeal Board (PTAB). Under the AIA's terms, three members from the PTAB—often,

as here, administrative patent judges (APJs)—sit on a panel to decide whether to cancel a patent. §6(c). After the three-member panel issues its decision, a party may seek rehearing from another three-member panel. *Ibid.* But only a PTAB panel—and no other official within the Executive Branch—may grant rehearing. *Ibid.* If that fails, a losing party's only recourse is to seek judicial review in the Court of Appeals for the Federal Circuit, which reviews the PTAB's factual findings under the deferential substantial evidence standard of review. See §319; *Oil States*, 584 U. S., at ___ (slip op., at 4).

Under this statutory arrangement, APJs are executive officers accountable to no one else in the Executive Branch. A panel of bureaucrats wields unreviewable power to take vested property rights. This design may hold its advantages for some. Often enough, the Director of the Patent and Trademark Office and the President may be happy to wash their hands of these decisions. But by breaking the chain of dependence, the statutory scheme denies individuals the right to be subjected only to *lawful* exercises of executive power that can ultimately be controlled by a President accountable to "the supreme body, namely, . . . the people."

\*

The real question here concerns what to do about it. In Part III of its opinion, the Court invokes severability doctrine. *Ante*, at 19–22. It "sever[s]" Congress's statutory direction that PTAB decisions may not be reviewed by the Director of the Patent Office—in that way reconnecting APJs to the chain of command and subjecting their decisions to a superior who is, in turn, ultimately accountable to the President. See *ibid.*

I don't question that we might proceed this way in some cases. Faced with an application of a statute that violates the Constitution, a court might look to the text of the law in

question to determine what Congress has said should happen in that event. Sometimes Congress includes "fallback" provisions of just this sort, and sometimes those provisions tell us to disregard this or that provision if its statutory scheme is later found to offend the Constitution. See, *e.g.*, *Bowsher* v. *Synar*, 478 U. S. 714, 718–719 (1986); see also Walsh, Partial Unconstitutionality, 85 N. Y. U. L. Rev. 738, 780–781 (2010).

The problem here is that Congress has said nothing of the sort. And here it is the combination of separate statutory provisions that conspire to create a constitutional violation. Through some provisions, Congress has authorized executive officers to cancel patents. §§6(b)(4), 318(a). Through others, it has made their exercise of that power unreviewable within the Executive Branch. See §§6(c), 318(b). It's the combination of these provisions—the exercise of executive power and unreviewability—that violates the Constitution's separation of powers.

Nor is there only one possible way out of the problem. First, one could choose as the Court does and make PTAB decisions subject to review by the Director, who is answerable to the President through a chain of dependence. See Duffy, Are Administrative Patent Judges Unconstitutional? 77 Geo. Wash. L. Rev. 904, 911 (2009). Separately, one could specify that PTAB panel members should be appointed by the President and confirmed by the Senate and render their decisions directly reviewable by the President. See Lawson, 26 Geo. Mason L. Rev., at 57. Separately still, one could reassign the power to cancel patents to the Judiciary where it resided for nearly two centuries. See *Oil States*, 584 U. S., at \_\_\_–\_\_\_ (GORSUCH, J., dissenting) (slip op., at 8–10). Without some direction from Congress, this problem cannot be resolved as a matter of statutory interpretation. All that remains is a policy choice.

In circumstances like these, I believe traditional remedial principles should be our guide. Early American courts did

not presume a power to "sever" and excise portions of statutes in response to constitutional violations. Instead, when the application of a statute violated the Constitution, courts simply declined to enforce the statute in the case or controversy at hand. See *Seila Law*, 591 U. S., at ___ (THOMAS, J., dissenting in part) (slip op., at 15); see also Walsh, N. Y. U. L. Rev., at 769. I would follow that course today by identifying the constitutional violation, explaining our reasoning, and "setting aside" the PTAB decision in this case. See *Novartis AG* v. *Torrent Pharmaceuticals Ltd.*, 853 F. 3d 1316, 1323–1324 (CA Fed. 2017) (holding that the standard in 5 U. S. C. §706 governs judicial review of PTAB decisions).

The Court declines to follow this traditional path. Instead, it imagines that, if Congress had known its statutory scheme was unconstitutional, it would have preferred to make the policy choice the Court makes for it today. Faced with an unconstitutional combination of statutory instructions—providing for the exercise of executive power and its unreviewability—the Court *chooses* to act as if the provision limiting the Director's ability to review IPR decisions doesn't exist. Having done that, the Court gifts the Director a new power that he never before enjoyed, a power Congress expressly withheld from him and gave to someone else—the power to cancel patents through the IPR process. Effectively, the Court subtracts statutory powers from one set of executive officials and adds them to another.

While the Court has in relatively recent years proclaimed the power to proceed in this fashion, it has never paused to explain how this "severance doctrine" comports with traditional judicial remedial principles. See *Barr* v. *American Assn. of Political Consultants, Inc.*, 591 U. S. ___, ___ (2020) (GORSUCH, J., concurring in judgment in part and dissenting in part) (slip op., at 5). Or with the fact that the judicial power is limited to resolving discrete cases and controversies. *Murphy* v. *National Collegiate Athletic Assn.*, 584

U. S. \_\_\_, \_\_\_–\_\_\_ (2018) (THOMAS, J., concurring) (slip op., at 2–3). Or with the framers' explicit rejection of allowing this Court to serve as a council of revision free to amend legislation. See Mitchell, The Writ-of-Erasure Fallacy, 104 Va. L. Rev. 933, 954–960 (2018). Let alone with our constant admonitions that policy choices belong to Congress, not this Court. *E.g.*, *Pereida* v. *Wilkinson*, 592 U. S. \_\_\_, \_\_\_ (2021) (slip op., at 16). And certainly none of the early cases the Court cites today proceeded as it does. See *ante*, at 19, 22.

Nor does the Court pause to consider whether venturing further down this remedial path today risks undermining the very separation of powers its merits decision purports to vindicate. While the Court's merits analysis ensures that executive power properly resides in the Executive Branch, its severability analysis seemingly confers legislative power to the Judiciary—endowing us with the authority to make a raw policy choice between competing lawful options. No doubt, if Congress is dissatisfied with the choice the Court makes on its behalf today, it can always reenter the field and revise our judgment. But doesn't that just underscore the legislative nature of the Court's judgment? And doesn't deciding for ourselves which policy course to pursue today allow Congress to disclaim responsibility for our legislative handiwork much as the President might the PTAB's executive decisions under the current statutory structure?

Instead of confronting these questions, the Court has justified modern "severance" doctrine on assumptions and presumptions about what Congress would have chosen to do, had it known that its statutory scheme was unconstitutional. See, *e.g.*, *Seila Law*, 591 U. S., at \_\_\_ (slip op., at 32) ("We will presume that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision" (internal quotation marks omitted)). But any claim about "congressional intent" divorced from enacted statutory text is an appeal to

mysticism. Short of summoning ghosts and spirits, how are we to know what those in a past Congress might think about a question they never expressed any view on—and may have never foreseen?

Let's be honest, too. These legislative séances usually wind up producing only the results intended by those conducting the performance: "When you are told to decide, not on the basis of what the legislature said, but on the basis of what it *meant*, . . . your best shot at figuring out what the legislature meant is to ask yourself what a wise and intelligent person *should* have meant; and that will surely bring you to the conclusion that the law means what you think it *ought* to mean." Scalia, Common Law Courts in a Civil-Law System, in A Matter of Interpretation: Federal Courts and the Law 18 (A. Gutmann ed. 1997); see also *United States* v. *Public Util. Comm'n of Cal.*, 345 U. S 295, 319 (1953) (Jackson, J., concurring) (describing that process as "not interpretation of a statute but creation of a statute"). The crystal ball ends up being more of a mirror.

Our case illustrates the problem. The Court apparently believes that Congress would have wanted us to render PTAB decisions reviewable by the Director. This regime is consistent with the "'standard federal model'" for agency adjudication. Walker & Wasserman, The New World of Agency Adjudication, 107 Cal. L. Rev. 141, 143–144 (2019). It's easy enough to see why a group of staid judges selecting among policy choices for itself might prefer a "standard" model. But if there is anything we know for certain about the AIA, it is that Congress *rejected* this familiar approach when it came to PTAB proceedings. Multiple *amici* contend that Congress did so specifically to ensure APJs enjoy "independence" from superior executive officers and thus possess more "impartiality." Brief for Fair Inventing Fund as *Amicus Curiae* 20–21 (quoting legislative history that Congress desired a "'fairer'" and "'more objective'" process); see also, *e.g.*, Brief for New Civil Liberties Alliance as *Amicus*

*Curiae* 6 (Congress sought "to preserve the independence of those conducting inter partes review"); Brief for US Inventor Inc. as *Amicus Curiae* 22 ("[I]t is plainly evident that Congress would not have enacted an APJ patentability trial system that was more political than the one they did enact"); Brief for Cato Institute et al. as *Amici Curiae* 20 (It was a "conscious congressional decision to provide individuals with the power to adjudicate (and often destroy) vested patent rights with some level of independence"). All of which suggests that the majority's severability analysis defies, rather than implements, legislative intent. At the least, it is surely plausible that, if faced with a choice between giving the power to cancel patents to political officials or returning it to courts where it historically resided, a Congress so concerned with independent decisionmaking might have chosen the latter option.

My point here isn't that I profess any certainty about what Congress would have chosen; it's that I confess none. Asking what a past Congress would have done if confronted with a contingency it never addressed calls for raw speculation. Speculation that, under traditional principles of judicial remedies, statutory interpretation, and the separation of powers, a court of law has no authority to undertake.

\*

If each new case this Court entertains about the AIA highlights more and more problems with the statute, for me the largest of them all is the wrong turn we took in *Oil States*. There, the Court upheld the power of the Executive Branch to strip vested property rights in patents despite a long history in this country allowing only courts that authority. See 584 U. S., at \_\_\_–\_\_\_ (GORSUCH, J., dissenting) (slip op., at 8–10). In the course of rejecting a separation-of-powers challenge to this novel redistribution of historic authority, the Court acknowledged the possibility that permitting politically motivated executive officials to "cancel"

patents might yet raise due process concerns. *Id.*, at ___ (slip op., at 17). But the Court refused to consider those concerns in *Oil States* because, it said, no one had "raised a due process challenge." *Ibid.*

It was my view at the time that the separation of powers—and its guarantee that cases involving the revocation of vested property rights must be decided by Article III courts—is *itself* part of the process that is due under our Constitution. See Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L. J. 1672, 1801–1804 (2012). Any suggestion that the neutrality and independence the framers guaranteed for courts could be replicated within the Executive Branch was never more than wishful thinking. The Court's decision in *Oil States* allowing executive officials to assume an historic judicial function was always destined to invite familiar due process problems—like decisions "favor[ing] those with political clout, the powerful and the popular." *Thryv, Inc.* v. *Click-To-Call Technologies, LP*, 590 U. S. ___, ___ (2020) (GORSUCH, J., dissenting) (slip op., at 20). After all, "[p]owerful interests are capable of amassing armies of lobbyists and lawyers to influence (and even capture) politically accountable bureaucracies." *Oil States*, 584 U. S., at ___ (same) (slip op., at 3).

Already in the AIA's short tenure these problems have started coming home to roost—even with supposedly "independent" APJs. The briefs before us highlight example after example. I leave the interested reader to explore others. See, *e.g.*, Brief for TiVo Corporation as *Amicus Curiae* 6–13; Brief for 39 Aggrieved Inventors as *Amici Curiae* 14–23; Brief for Joshua J. Malone as *Amicus Curiae* 9–11. Here just consider the tale of a patent attorney at one of the world's largest technology companies who left the company to become an APJ. See Brief for US Inventor Inc. as *Amicus Curiae* 12. This private advocate-turned-APJ presided over dozens of IPRs brought by his former company. *Ibid.* In

those proceedings, the company prevailed in its efforts to cancel patents damaging to its private economic interests 96% of the time. *Ibid.* After six years of work, the APJ decided he had done enough, resigned, and (yes) returned to the company. *Ibid.* Without a hint of irony, that company has filed an *amicus* brief in this case to inform us, as a self-described "frequent user of the IPR process," about "the benefits of the system." Brief for Apple Inc. as *Amicus Curiae* 3. Nor is that the only large technology company to have its attorneys rotate in and out of the PTO to similar effect. See Brief for B. E. Technology, LLC, as *Amicus Curiae* 17 (discussing a Google attorney). *Oil States* virtually assured results like these.

That's not the end of the constitutional problems flowing from *Oil States* either. The Director has asserted "plenary authority" to personally select which APJs will decide an IPR proceeding. Brief for United States 5–6. Thus, any APJs whose rulings displease the party currently in power could soon find themselves with little to do. The PTAB has even "claimed the power through inter partes review to overrule final judicial judgments affirming patent rights." *Thryv*, 590 U. S., at ___ (GORSUCH, J., dissenting) (slip op., at 20). And this menu of constitutional problems is surely just illustrative, not exhaustive.

Today's decision at least avoids the very worst of what *Oil States* could have become—investing the power to revoke individual's property rights in some unaccountable fourth branch controlled by powerful companies seeking a competitive advantage. Alignments between the moneyed and the permanent bureaucracy to advance the narrow interests of the elite are as old as bureaucracy itself. Our decision today represents a very small step back in the right direction by ensuring that the people at least know who's responsible for supervising this process—the elected President and his designees.

Still, I harbor no illusions that today's decision will resolve

all the problems. Even if our judgment demands some degree of democratic accountability in the IPR process, it does not begin to fix the revolving door or any of the other due process problems *Oil States* ignored. No doubt, challenges involving those aspects of the IPR process will come. When they do, I hope this Court will come to recognize what was evident for so much of our history—that the process due someone with a vested property right in a patent is a proceeding before a neutral and independent judge.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 19–1434, 19–1452 and 19–1458

———————

UNITED STATES, PETITIONER
19–1434                 *v.*
ARTHREX, INC., ET AL.


SMITH & NEPHEW, INC., ET AL., PETITIONERS
19–1452                 *v.*
ARTHREX, INC., ET AL.


ARTHREX, INC., PETITIONER
19–1458                 *v.*
SMITH & NEPHEW, INC., ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[June 21, 2021]

JUSTICE BREYER, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, concurring in the judgment in part and dissenting in part.

I

I agree with JUSTICE THOMAS' discussion on the merits and I join Parts I and II of his dissent. Two related considerations also persuade me that his conclusion is correct.

*First*, in my view, the Court should interpret the Appointments Clause as granting Congress a degree of leeway to establish and empower federal offices. Neither that Clause nor anything else in the Constitution describes the degree of control that a superior officer must exercise over the decisions of an inferior officer. To the contrary, the Constitution says only that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, . . . in

the Heads of Departments." Art. II, §2, cl. 2. The words "by Law . . . as they think proper" strongly suggest that Congress has considerable freedom to determine the nature of an inferior officer's job, and that courts ought to respect that judgment. See *Lucia* v. *SEC*, 585 U. S. ___, ___–___ (2018) (BREYER, J., concurring in judgment in part and dissenting in part) (slip op., at 9–10). In a word, the Constitution grants to Congress the "authority to create both categories of offices—those the President must fill with the Senate's concurrence and 'inferior' ones. . . . That constitutional assignment to Congress counsels judicial deference." *In re Sealed Case*, 838 F. 2d 476, 532 (CADC) (R. Ginsburg, J., dissenting), rev'd *sub nom. Morrison* v. *Olson*, 487 U. S. 654 (1988). Article I's grant to Congress of broad authority to enact laws of different kinds concerning different subjects— and to implement those laws in ways that Congress determines are "necessary and proper"—suggests the same. Art. I, §8, cl. 18.

Even a small degree of "judicial deference" should prove sufficient to validate the statutes here. For one, the provisions at issue fall well within Article I's grant to Congress of the patent power. Nothing in them represents an effort by the "Legislative Branch [to] aggrandize itself at the expense of the other two branches." *Buckley* v. *Valeo*, 424 U. S. 1, 129 (1976) (*per curiam*). There is accordingly no general separation-of-powers defect that has arisen in other cases. See, *e.g., Metropolitan Washington Airports Authority* v. *Citizens for Abatement of Aircraft Noise, Inc.*, 501 U. S. 252, 277 (1991).

For another, Congress' scheme is consistent with our Appointments Clause precedents. They require only that an inferior officer be "directed and supervised at some level," *Edmond* v. *United States*, 520 U. S. 651, 663 (1997), and the Administrative Patent Judges (APJs) are supervised by two separate Senate-confirmed officers, the Secretary of Commerce and the Director of the Patent and Trademark Office

(PTO). Even were I to assume, with the majority, that the Director must have power to "control" the APJs, the statutes grant the Director considerable control. As the Court recognizes, the Director "fixes" their "rate[s] of pay," decides "whether to institute inter partes review," "selects the APJ's" who will preside at each particular proceeding, "promulgates regulations governing inter partes review," "issues prospective guidance on patentability issues," and "designates past PTAB decisions as 'precedential' for future panels." *Ante,* at 10. All told, the Director maintains control of decisions insofar as they determine policy. The Director cannot rehear and decide an individual case on his own; but Congress had good reason for seeking independent Board determinations in those cases—cases that will apply, not create, Director-controlled policy.

Finally, Congress' judgment is unusually clear in this suit, as there is strong evidence that Congress designed the current structure specifically to address constitutional concerns. See *In re DBC*, 545 F. 3d 1373, 1377–1380 (CA Fed. 2008) (explaining amendment to address defects in prior appointment process).

*Second,* I believe the Court, when deciding cases such as these, should conduct a functional examination of the offices and duties in question rather than a formalist, judicial-rules-based approach. In advocating for a "functional approach," I mean an approach that would take account of, and place weight on, why Congress enacted a particular statutory limitation. It would also consider the practical consequences that are likely to follow from Congress' chosen scheme.

*Wiener* v. *United States*, 357 U. S. 349 (1958), provides a good example of the role that purposes and consequences can play. In that case, the Court considered whether, in the face of congressional silence on the matter, the President had the constitutional or statutory authority to remove without cause a member of the War Claims Commission.

Justice Frankfurter, writing for a unanimous Court, said that Congress sought to create a commission that was "'entirely free from the control or coercive influence, direct or indirect,' of either the Executive or the Congress." *Id.,* at 355–356 (quoting *Humphrey's Executor* v. *United States*, 295 U. S. 602, 629 (1935)). He then asked why Congress might want to deny the President the power to remove a commissioner. Because, he answered, the "intrinsic judicial character" of the Commission's duties required that it be able to adjudicate claims solely on the merits of each claim free of external executive pressure. 357 U. S., at 355. "Congress did not wish to have hang over the Commission the Damocles' sword of removal by the President for no reason other than that he preferred to have on that Commission men of his own choosing." *Id.,* at 356. The Court has subsequently used the functional approach reflected in *Wiener* to resolve all manner of separation-of-powers disputes, including disputes under the Appointments Clause. See, *e.g., Buckley*, 424 U. S., at 126 (distinguishing employees from officers by asking if the individual exercises "significant authority"); *Mistretta* v. *United States*, 488 U. S. 361, 409 (1989) (asking whether a statute "prevents the Judicial Branch from performing its constitutionally assigned functions").

In this suit, a functional approach, which considers purposes and consequences, undermines the Court's result. Most agencies (and courts for that matter) have the power to reconsider an earlier decision, changing the initial result if appropriate. Congress believed that the PTO should have that same power and accordingly created procedures for reconsidering issued patents. Congress also believed it important to strengthen the reconsideration power with procedural safeguards that would often help those whom the PTO's initial decision had favored, such as the requirement that review be available only when there is a "reasonable likelihood" that the patent will be invalid. 35 U. S. C.

§314(a). Given the technical nature of patents, the need for expertise, and the importance of avoiding political interference, Congress chose to grant the APJs a degree of independence. These considerations set forth a reasonable legislative objective sufficient to justify the restriction upon the Director's authority that Congress imposed. And, as JUSTICE THOMAS thoroughly explains, there is no reason to believe this scheme will prevent the Director from exercising policy control over the APJs or will break the chain of accountability that is needed to hold the President responsible for bad nominations. *Post*, at 7–10 (dissenting opinion).

The Court does not take these realities into account. Instead, for the first time, it examines the APJs' office function by function and finds, in *Edmond*, a judicially created rule: "Only an officer properly appointed to a principal office may issue a final decision binding the Executive Branch in [inter partes review] proceeding[s]." *Ante,* at 19. As an initial matter, I agree with JUSTICE THOMAS that this rule has no foundation in *Edmond* or our Appointments Clause precedents. *Post*, at 10–11.

More broadly, I see the Court's decision as one part of a larger shift in our separation-of-powers jurisprudence. The Court applied a similarly formal approach in *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477 (2010), where it considered the constitutional status of the members of an accounting board appointed by the Securities and Exchange Commission. It held that Congress could not limit the SEC's power to remove those members without cause. The Court also applied a formalist approach in *Seila Law LLC* v. *Consumer Financial Protection Bureau*, 591 U. S. \_\_\_ (2020), where it held that Congress could not protect from removal without cause the (single) head of the Consumer Financial Protection Bureau. My dissent in the first case and JUSTICE KAGAN's dissent in the second explain in greater detail why we believed that this

shift toward formalism was a mistake.

I continue to believe that a more functional approach to constitutional interpretation in this area is superior. As for this particular suit, the consequences of the majority's rule are clear. The nature of the PTAB calls for technically correct adjudicatory decisions. And, as in *Wiener*, that fact calls for greater, not less, independence from those potentially influenced by political factors. The Court's decision prevents Congress from establishing a patent scheme consistent with that idea.

But there are further reasons for a functional approach that extend beyond the bounds of patent adjudication. First, the Executive Branch has many different constituent bodies, many different bureaus, many different agencies, many different tasks, many different kinds of employees. Administration comes in many different shapes and sizes. Appreciating this variety is especially important in the context of administrative adjudication, which typically demands decisionmaking (at least where policy made by others is simply applied) that is free of political influence. Are the President and Congress, through judicial insistence upon certain mechanisms for removal or review, to be denied the ability to create independent adjudicators?

Second, the Constitution is not a detailed tax code, and for good reason. The Nation's desires and needs change, sometimes over long periods of time. In the 19th century the Judiciary may not have foreseen the changes that produced the New Deal, along with its accompanying changes in the nature of the tasks that Government was expected to perform. We may not now easily foresee just what kinds of tasks present or future technological changes will call for. The Founders wrote a Constitution that they believed was flexible enough to respond to new needs as those needs developed and changed over the course of decades or centuries. At the same time, they designed a Constitution that

would protect certain basic principles. A principle that prevents Congress from affording inferior level adjudicators some decisionmaking independence was not among them.

Finally, the Executive Branch and Congress are more likely than are judges to understand how to implement the tasks that Congress has written into legislation. That understanding encompasses the nature of different mechanisms of bureaucratic control that may apply to the many thousands of administrators who will carry out those tasks. And it includes an awareness of the reasonable limits that can be placed on supervisors to ensure that those working under them enjoy a degree of freedom sufficient to carry out their responsibilities. Considered as a group, unelected judges have little, if any, experience related to this kind of a problem.

This is not to say that the Constitution grants Congress free rein. But in this area of the law a functional approach, when compared with the highly detailed judicial-rules-based approach reflected in the Court's decision, is more likely to prevent inappropriate judicial interference. It embodies, at least to a degree, the philosopher's advice: "Whereof one cannot speak, thereof one must be silent."

## II

For the reasons I have set forth above, I do not agree with the Court's basic constitutional determination. For purposes of determining a remedy, however, I recognize that a majority of the Court has reached a contrary conclusion. On this score, I believe that any remedy should be tailored to the constitutional violation. Under the Court's new test, the current statutory scheme is defective only because the APJ's decisions are not reviewable by the Director alone. The Court's remedy addresses that specific problem, and for that reason I agree with its remedial holding.

Opinion of BREYER, J.

\* \* \*

In my view, today's decision is both unprecedented and unnecessary, and risks pushing the Judiciary further into areas where we lack both the authority to act and the capacity to act wisely. I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 19–1434, 19–1452 and 19–1458

_____

UNITED STATES, PETITIONER
19–1434　　　　　　　_v._
ARTHREX, INC., ET AL.


SMITH & NEPHEW, INC., ET AL., PETITIONERS
19–1452　　　　　　　_v._
ARTHREX, INC., ET AL.


ARTHREX, INC., PETITIONER
19–1458　　　　　　　_v._
SMITH & NEPHEW, INC., ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT

[June 21, 2021]

JUSTICE THOMAS, with whom JUSTICE BREYER, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join as to Parts I and II, dissenting.

For the very first time, this Court holds that Congress violated the Constitution by vesting the appointment of a federal officer in the head of a department. Just who are these "principal" officers that Congress unsuccessfully sought to smuggle into the Executive Branch without Senate confirmation? About 250 administrative patent judges who sit at the bottom of an organizational chart, nestled under at least two levels of authority. Neither our precedent nor the original understanding of the Appointments Clause requires Senate confirmation of officers inferior to not one, but _two_ officers below the President.

## I

The Executive Branch is large, and the hierarchical path from President to administrative patent judge is long. At the top sits the President, in whom the executive power is vested. U. S. Const., Art. II, §1. Below him is the Secretary of Commerce, who oversees the Department of Commerce and its work force of about 46,000. 15 U. S. C. §§1501, 1513. Within that Department is the United States Patent and Trademark Office led by a Director. 35 U. S. C. §§1, 2(a), 3(a) (also known as the Under Secretary of Commerce for Intellectual Property). In the Patent and Trademark Office is the Patent Trial and Appeal Board. §6(a). Serving on this Board are administrative patent judges. *Ibid.*

There are few statutory prerequisites to becoming an administrative patent judge. One must be a "perso[n] of competent legal knowledge and scientific ability" and be "appointed by the Secretary." *Ibid.* The job description too is relatively straightforward: sit on the Board along with the Director, the Deputy Director, the Commissioner for Patents, the Commissioner for Trademarks, and other administrative patent judges. *Ibid.*

The Board adjudicates both appellate and trial disputes. See §6(b). It may directly review certain decisions made by patent examiners, and it may hold its own proceedings to determine the patentability of patent claims. As relevant here, it conducts inter partes review, which "offers a second look at an earlier administrative grant of a patent." *Cuozzo Speed Technologies*, *LLC* v. *Lee*, 579 U. S. 261, 279 (2016). Inter partes review—and all other types of Board hearings—must be "heard by at least 3 members" of the Board. §6(c).

In this suit, Smith & Nephew, Inc., and Arthrocare Corp. (collectively, Smith & Nephew) filed a petition challenging some of Arthrex, Inc.'s patent claims. After deciding that there was a reasonable likelihood that Smith & Nephew would prevail, the Director instituted review. §314(a). A

panel of three administrative judges ultimately agreed with Smith & Nephew that the disputed claims were unpatentable. The Director did not convene a panel to rehear that decision. Nor is there any suggestion that Arthrex sought rehearing from the Board or from the Director. Instead, Arthrex appealed the Board's decision to the United States Court of Appeals for the Federal Circuit.

On appeal, Arthrex argued that the Federal Circuit must vacate the Board's decision. According to Arthrex, administrative patent judges are constitutionally defective because they are principal officers who were neither appointed by the President nor confirmed by the Senate. The Federal Circuit agreed in part. The court held that administrative patent judges *are* principal officers. 941 F. 3d 1320, 1335 (2019). But the court professed to transform these principal officers into inferior ones by withdrawing statutory removal restrictions. *Id.,* at 1338.

The Court now partially agrees with the Federal Circuit. Although it cannot quite bring itself to say so expressly, it too appears to hold that administrative patent judges are principal officers under the current statutory scheme. See *ante,* at 10–14. But it concludes that the better way to judicially convert these principal officers to inferior ones is to allow the Director to review Board decisions unilaterally. *Ante,* at 21 (plurality opinion); *ante,* at 7 (BREYER, J., concurring in part and dissenting in part).

That both the Federal Circuit and this Court would take so much care to ensure that administrative patent judges, appointed as inferior officers, would remain inferior officers at the end of the day suggests that perhaps they were inferior officers to begin with. Instead of rewriting the Director's statutory powers, I would simply leave intact the patent scheme Congress has created.

## II

The Constitution creates a default process to appoint all

officers: The President "by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States."  Art. II, §2.  But Congress has discretion to change the default process for "inferior" officers: "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Ibid.*

A

The Court has been careful not to create a rigid test to divide principal officers—those who must be Senate confirmed—from inferior ones.  See, *e.g.*, *Edmond* v. *United States*, 520 U. S. 651, 661 (1997) (the Court has "not set forth an exclusive criterion"); *Morrison* v. *Olson,* 487 U. S. 654, 671 (1988) ("We need not attempt here to decide exactly where the line falls between the two types of officers"). Instead, the Court's opinions have traditionally used a case-by-case analysis.  And those analyses invariably result in this Court deferring to Congress' choice of which constitutional appointment process works best.[1]  No party (nor the

_____

[1] This Court has found a vast range of positions to be inferior, including a district court clerk, *Ex parte Hennen*, 13 Pet. 230, 258 (1839) ("that a clerk is one of the inferior officers contemplated by . . . the Constitution cannot be questioned"); election supervisors tasked with registering names, inspecting and scrutinizing the register of voters, and counting the votes cast, *Ex parte Siebold*, 100 U. S. 371, 380, 398 (1880) ("Congress had the power to vest the appointment of the supervisors in question in the circuit courts"); a vice consul who temporarily carried out the duties of the consul, *United States* v. *Eaton*, 169 U. S. 331, 343 (1898) ("The claim that Congress was without power to vest in the President the appointment of a subordinate officer called a vice-consul, to be charged with the duty of temporarily performing the functions of the consular office, disregards both the letter and spirit of the Constitution"); a United States Commissioner, entrusted with "issu[ing] warrants," "caus[ing] the offenders to be arrested and imprisoned, or bailed, for trial," "sit[ting] as

majority) has identified any instance in which this Court has found unconstitutional an appointment that aligns with one of the two processes outlined in the Constitution.

Our most exhaustive treatment of the inferior-officer question is found in *Edmond*. There, we evaluated the status of civilian judges on the Coast Guard Court of Criminal Appeals who were appointed by the Secretary of Transportation. As in all previous decisions, the Court in *Edmond* held that the Secretary's appointment of the judges complied with the Appointments Clause.

Recognizing that no "definitive test" existed for distinguishing between inferior and principal officers, the Court set out two general guidelines. 520 U. S., at 661–662. First, there is a formal, definitional requirement. The officer must be lower in rank to "a superior." *Id.*, at 662. But according to the Court in *Edmond*, formal inferiority is "not enough." *Ibid.* So the Court imposed a functional requirement: The inferior officer's work must be "directed and supervised at some level by others who were appointed by

———————

judge or arbitrator in such differences as may arise between the captains and crews of any vessels belonging to the nations whose interests are committed to his charge"; "institut[ing] prosecutions" and who enjoys "to a certain extent, independen[ce] in their statutory and judicial action," *United States* v. *Allred*, 155 U. S. 591, 594–595 (1895); *Go-Bart Importing Co.* v. *United States*, 282 U. S. 344, 352–354 (1931) ("United States commissioners are inferior officers"); an independent counsel, charged with "'full power and independent authority to exercise all investigative and prosecutorial functions,'" *Morrison*, 487 U. S., at 661, 661–662, 671–672; special trial judges within the United States Tax Court "who exercise independent authority" and may "hear certain specifically described proceedings" and may "render the decisions of the Tax Court in declaratory judgment proceedings and limited-amount tax cases," *Freytag* v. *Commissioner*, 501 U. S. 868, 870–871, 882 (1991); judges on the Coast Guard Court of Criminal Appeals, *Edmond*, 520 U. S., at 653; and members of the Public Company Accounting Oversight Board who "determin[e] the policy and enforc[e] the laws of the United States," *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 484, 511 (2010).

Presidential nomination with advice and consent of the Senate." *Id.*, at 663. Because neither side asks us to overrule our precedent, I would apply this two-part guide.

There can be no dispute that administrative patent judges are, in fact, inferior: They are lower in rank to at least two different officers. As part of the Board, they serve in the Patent and Trademark Office, run by a Director "responsible for providing policy direction and management supervision for the Office and for the issuance of patents and the registration of trademarks." 35 U. S. C. §3(a)(2)(A). That Office, in turn, is "[w]ithin the Department of Commerce" and "subject to the policy direction of the Secretary of Commerce." §1(a). The Secretary, in consultation with the Director, appoints administrative patent judges. §6(a).

As a comparison to the facts in *Edmond* illustrates, the Director and Secretary are also functionally superior because they supervise and direct the work administrative patent judges perform. In *Edmond*, the Court focused on the supervision exercised by two different entities: the Judge Advocate General and the Court of Appeals for the Armed Forces (CAAF). The Judge Advocate General exercised general administrative oversight over the court on which the military judges sat. *Edmond*, 520 U. S., at 664. He possessed the power to prescribe uniform rules of procedure for the court and to formulate policies and procedure with respect to the review of court-martial cases in general. *Ibid.* And he could remove a Court of Criminal Appeals judge from his judicial assignment without cause, a "powerful tool for control." *Ibid.*

The Court noted, however, that "[t]he Judge Advocate General's control over Court of Criminal Appeals judges is . . . not complete." *Ibid.* This was so for two reasons. He could "not attempt to influence (by threat of removal or otherwise) the outcome of individual proceedings." *Ibid.* And, he had "no power to reverse decisions of the court." *Ibid.*

But this lack of complete control did not render the military judges principal officers. That is because one of the two missing powers resided, to a limited degree, in a different entity: the CAAF. *Ibid.* CAAF could not "reevaluate the facts" where "there [was] some competent evidence in the record to establish each element of the offense beyond a reasonable doubt." *Id.*, at 665. Still, it was "significant . . . that the judges of the Court of Criminal Appeals ha[d] no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Ibid.* Having recounted the various means of supervision, the Court held that the military judges were inferior officers. Consistent with the Constitution, Congress had the power to vest the judges' appointments in the Secretary of Transportation. *Id.*, at 665–666.

The Director here possesses even greater functional power over the Board than that possessed by the Judge Advocate General. Like the Judge Advocate General, the Director exercises administrative oversight over the Board. Because the Board is within the Patent and Trademark Office, all of its powers and duties are ultimately held by the Director. 35 U. S. C. §3(a)(1). He "direct[s]" and "supervis[es]" the Office and "the issuance of patents." §3(a)(2)(A). He may even "fix the rate of basic pay for the administrative patent judges." §3(b)(6). And ultimately, after the Board has reached a decision in a specific case, the Director alone has the power to take final action to cancel a patent claim or confirm it. §318(b).

Also like the Judge Advocate General in *Edmond*, the Director prescribes uniform procedural rules and formulates policies and procedures for Board proceedings. Among other things, he has issued detailed regulations that govern "Trial Practice and Procedure" before the Board. 37 CFR pt. 42 (2020); see also *ibid.* (prescribing regulations governing, *inter alia*, discovery, oral argument, termination of trial, notice, privilege, filing fees, etc.); see also 35 U. S. C.

§§2(b)(2), 316(a)(4), 326(a)(4). He has designed a process to designate and de-designate Board decisions as precedential. Patent Trial and Appeal Board, Standard Operating Procedure 2 (Revision 10), pp. 1–2 (Sept. 20, 2018) (SOP2). He may issue binding policy directives that govern the Board. §3(a)(2)(A). And he may release "instructions that include exemplary applications of patent laws to fact patterns, which the Board can refer to when presented with factually similar cases." 941 F. 3d, at 1331. His oversight is not just administrative; it is substantive as well. §3(a)(2)(A).

The Director has yet another "powerful tool for control." *Edmond*, 520 U. S., at 664. He may designate which of the 250-plus administrative patent judges hear certain cases and may remove administrative patent judges from their specific assignments without cause. See §6(c). So, if any administrative patent judges depart from the Director's direction, he has ample power to rein them in to avoid erroneous decisions. And, if an administrative patent judge consistently fails to follow instructions, the Secretary has the authority to fire him. 5 U. S. C. §7513(a); 35 U. S. C. §3(c); *Cobert* v. *Miller*, 800 F. 3d 1340, 1351 (CA Fed. 2015) (interpreting §7513(a) to allow removal for "'[f]ailure to follow instructions or abide by requirements [that] affec[t] the agency's ability to carry out its mission'").[2]

To be sure, the Director's power over administrative patent judges is not complete. He cannot singlehandedly reverse decisions. Still, he has two powerful checks on Board decisions not found in *Edmond*.

Unlike the Judge Advocate General and CAAF in *Edmond*, the Director *may* influence individual proceedings.

---

[2] Although not applicable to any who served on the Board in this suit, a small subset of administrative patent judges are subject to a slightly different removal standard. See 83 Fed. Reg. 29324 (2018); see also 5 U. S. C. §7543(a); 5 CFR pt. 359 (2020); Brief for United States 5, n. 1.

The Director decides in the first instance whether to institute, refuse to institute, or de-institute particular reviews, a decision that is "final and nonappealable." 35 U. S. C. §314(d); see also §314(a). If the Director institutes review, he then may select which administrative patent judges will hear the challenge. §6(c). Alternatively, he can avoid assigning *any* administrative patent judge to a specific dispute and instead designate himself, his Deputy Director, and the Commissioner of Patents. In addition, the Director decides which of the thousands of decisions issued each year bind other panels as precedent. SOP2, at 8. No statute bars the Director from taking an active role to ensure the Board's decisions conform to his policy direction.

But, that is not all. If the administrative patent judges "(somehow) reach a result he does not like, the Director can add more members to the panel—including himself—and order the case reheard." *Oil States Energy Services*, *LLC* v. *Greene's Energy Group*, *LLC*, 584 U. S. \_\_\_, \_\_\_ (2018) (GORSUCH, J., dissenting) (slip op., at 3). There is a formalized process for this type of review. The Director may unilaterally convene a special panel—the Precedential Opinion Panel—to review a decision in a case and determine whether to order rehearing *sua sponte*. SOP2, at 5. (Any party to a proceeding or any Board member can also recommend rehearing by the Precedential Opinion Panel. *Ibid.*) The default members of the panel are the Director, the Commissioner for Patents, and the Chief Administrative Patent Judge. *Id.*, at 4. So even if *all* administrative patent judges decide to defy the Director's authority and go their respective ways, the Director and the Commissioner for Patents can still put a stop to it. And, if the Commissioner for Patents is running amuck, the Director may expand the size of the panel or may replace the Commissioner with someone else, including his Deputy Director. *Ibid.* Further, this panel is not limited to reviewing whether there is "competent evidence" as the CAAF was. It can correct anything

that may "have been misapprehended or overlooked" in the previous opinion.  37 CFR §41.79(b)(1).  This broad oversight ensures that administrative patent judges "have no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers."  *Edmond*, 520 U. S., at 665.

## B

The Court today appears largely to agree with all of this.  "In every respect" save one, the plurality says, "[administrative patent judges] appear to be inferior officers."  *Ante*, at 20–21.  But instead of finding it persuasive that administrative patent judges seem to be inferior officers—"an understanding consistent with their appointment"—the majority suggests most of *Edmond* is superfluous: All that matters is whether the Director has the statutory authority to individually reverse Board decisions.  See *ante*, at 10; see also *ante*, at 20 (plurality opinion).

The problem with that theory is that there is no precedential basis (or historical support)[3] for boiling down "inferior-officer" status to the way Congress structured a particular agency's process for reviewing decisions.  If anything, *Edmond* stands for the proposition that a "limitation upon review does not . . . render [officers] principal officers."  520 U. S., at 665.  Recall that the CAAF could not reevaluate certain factual conclusions reached by the military judges on the Court of Criminal Appeals.  *Ibid.*  And recall that neither CAAF nor the Judge Advocate General could "attempt to influence" individual proceedings.  *Id.*, at 664.  Yet, those constraints on supervision and control did not matter because the Court in *Edmond* considered all the means of supervision and control exercised by the superior officers.  Although CAAF could not reevaluate everything, "[w]hat is significant" is that CAAF could oversee the military judges

---

[3] See Part IV, *infra.*

in other ways: The military judges could not render "a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Id.*, at 665. Here, the Director cannot singlehandedly reevaluate individual decisions, but he still directs and "supervises . . . the Board members responsible for deciding patent disputes." *Oil States Energy Services*, 584 U. S., at \_\_\_ (GORSUCH, J., dissenting) (slip op., at 3).

C

Perhaps the better way to understand the Court's opinion today is as creating a new form of intrabranch separation-of-powers law. Traditionally, the Court's task when resolving Appointments Clause challenges has been to discern whether the challenged official qualifies as a specific sort of officer and whether his appointment complies with the Constitution. See *Lucia* v. *SEC*, 585 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 1) ("This case requires us to decide whether administrative law judges . . . qualify as [officers of the United States]"). If the official's appointment is inconsistent with the constitutional appointment process for the position he holds, then the Court provides a remedy. *Id.*, at \_\_\_ (slip op., at 12). Otherwise, the Court must conclude that the "appointments at issue in th[e] case are . . . valid." *Edmond*, 520 U. S., at 666.

Today's majority leaves that tried-and-true approach behind. It never expressly tells us whether administrative patent judges are inferior officers or principal. And the Court never tells us whether the appointment process complies with the Constitution. The closest the Court comes is to say that "the source of the constitutional violation" is *not* "the appointment of [administrative patent judges] by the Secretary." *Ante*, at 23 (plurality opinion). Under our precedent and the Constitution's text, that should resolve the suit. If the appointment process for administrative patent judges—appointment by the Secretary—does not violate

the Constitution, then administrative patent judges must be inferior officers. See Art. II, §2, cl. 2. And if administrative patent judges are inferior officers and have been properly appointed as such, then the Appointments Clause challenge fails. After all, the Constitution provides that "Congress may by Law vest the Appointment of . . . inferior Officers . . . in the Heads of Departments." *Ibid.*

The majority's new Appointments Clause doctrine, though, has nothing to do with the validity of an officer's appointment. Instead, it polices the dispersion of executive power among officers. Echoing our doctrine that Congress may not mix duties and powers from different branches into one actor, the Court finds that the constitutional problem here is that Congress has given a specific power—the authority to finally adjudicate inter partes review disputes—to one type of executive officer that the Constitution gives to another. See *ante*, at 21 (plurality opinion); see also, *e.g.*, *Stern* v. *Marshall*, 564 U. S. 462, 503 (2011) (assignment of Article III power to Bankruptcy Judge); *Bowsher* v. *Synar*, 478 U. S. 714, 728–735 (1986) (assignment of executive power to a legislative officer). That analysis is doubly flawed.

For one thing, our separation-of-powers analysis does not fit. The Constitution recognizes executive, legislative, and judicial power, and it vests those powers in specific branches. Nowhere does the Constitution acknowledge any such thing as "inferior-officer power" or "principal-officer power." And it certainly does not distinguish between these sorts of powers in the Appointments Clause.

And even if it did, early patent dispute schemes establish that the power exercised by the administrative patent judges here does not belong exclusively to principal officers. Nonprincipal officers could—and did—render final decisions in specific patent disputes, not subject to any appeal to a superior executive officer. In 1793, Congress provided that resolution of disputes, where two applicants sought a

patent for the same invention, "shall be submitted to the arbitration of three persons" chosen by the Secretary or by the parties, and that "the decision or award . . . , delivered to the Secretary of State . . . or any two of them, shall be final, as far as respects the granting of the patent." Act of Feb. 21, 1793, §9, 1 Stat. 322–333. In 1836, Congress allowed applicants to appeal the denial of a patent application to "a board of examiners, to be composed of three disinterested persons, who shall be appointed for that purpose by the Secretary of State." Act of July 4, 1836, §7, 5 Stat. 119–120. The Board had the power "to reverse the decision of the Commissioner, either in whole or in part," and the decision governed "further proceedings." *Ibid.* These two early examples show, at a minimum, that the final resolution of patent disputes is not the sole preserve of principal officers.

More broadly, interpreting the Appointments Clause to bar any nonprincipal officer from taking "final" action poses serious line-drawing problems. The majority assures that not every decision by an inferior officer must be reviewable by a superior officer. *Ante*, at 19. But this sparks more questions than it answers. Can a line prosecutor offer a plea deal without sign off from a principal officer?[4] If faced with a life-threatening scenario, can an FBI agent use deadly force to subdue a suspect? Or if an inferior officer temporarily fills a vacant office tasked with making final decisions, do those decisions violate the Appointments

_____

[4] And all this contemplates that it is easy to distinguish between a principal and inferior officer. But recall that the default appointment scheme for *all* officers—inferior and principal alike—is Presidential appointment and Senate confirmation. Senate confirmation says nothing about whether an officer is principal or inferior for constitutional purposes. Cf. 2 Opinion of Office of Legal Counsel 58, 59 (1978) (concluding that United States Attorneys "can be considered to be inferior officers," even though Congress has never "exercised its discretionary power to vest the appointment of U. S. Attorneys in the Attorney General").

Clause?[5]  And are courts around the country supposed to
sort through lists of each officer's (or employee's) duties,
categorize each one as principal or inferior, and then excise
any that look problematic?

Beyond those questions, the majority's nebulous ap-
proach also leaves open the question of how much "principal-
officer power" someone must wield before he becomes a
principal officer.  What happens if an officer typically en-
gages in normal inferior-officer work but also has several
principal-officer duties?  Is he a hybrid officer, properly ap-
pointed for four days a week and improperly appointed for
the fifth?  And whatever test the Court ultimately comes up
with to sort through these difficult questions, are we sure it
is encapsulated in the two words "inferior officer"?

### D

The majority offers one last theory.  Although the parties
raise only an Appointments Clause challenge and the plu-
rality concedes that there is no appointment defect, *ante,* at
23, the Court appears to suggest that the *real* issue is that
this scheme violates the Vesting Clause.  See Art. II, §1,
cl.1; see also a*nte*, at 13–14 (citing *Free Enterprise Fund* v.
*Public Company Accounting Oversight Bd.*, 561 U. S. 477,
496 (2010)); *Myers* v. *United States*, 272 U. S. 52, 135
(1926)).  According to the majority, the PTAB's review pro-
cess inverts the executive "chain of command," allowing ad-
ministrative patent judges to wield "unchecked . . . execu-
tive power" and to "dictat[e]" what the Director must do.
*Ante*, at 11, 14.  This final offering falters for several rea-
sons.

First no court below passed on this issue.  See 941 F. 3d,

---

    [5] See *Eaton*, 169 U. S., at 343 ("The claim that Congress was without
power to vest in the President the appointment of a subordinate officer
called a vice-consul, to be charged with the duty of temporarily perform-
ing the functions of the consular office, disregards both the letter and
spirit of the Constitution").

at 1327 (addressing whether "the [administrative patent judges] who presided over this *inter partes* review were . . . constitutionally appointed"). Given that this Court is generally one "of review, not of first view," it is unclear why we would grant relief on this ground. *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005).

Second, the idea that administrative patent judges are at the *top* of the chain of command is belied not only by the statutory scheme, see *supra,* at 7–10, but also by the majority's own refusal to ever name these judges principal officers. See *ante,* at 19.

Third, even if the chain of command were broken, Senate confirmation of an administrative patent judge would offer no fix. As Madison explained, the Senate's role in appointments is an *exception* to the vesting of executive power in the President; it gives another branch a say in the hiring of executive officials. 1 Annals of Cong. 463 (1789). An Article II Vesting Clause problem cannot be remedied by stripping away even more power from the Executive.

Fourth, and finally, historical practice establishes that the vesting of executive power in the President did not require that every patent decision be appealable to a principal officer. As the majority correctly explains, these sorts of final decisions were routinely made by inferior executive officers (or, perhaps, by mere executive employees). See *ante*, at 17–18. If no statutory path to appeal to an executive principal officer existed then, I see no constitutional reason why such a path must exist now.

Perhaps this Vesting Clause theory misunderstands the majority's argument. After all, the Court never directly says that any law or action violates the Vesting Clause. The Court simply criticizes as overly formalistic the notion that both Clauses do exactly what their names suggest: The Appointments Clause governs only appointments; the Vesting Clause deals just with the vesting of executive power in the President. *Ante*, at 13. I would not be so quick to stare

deeply into the penumbras of the Clauses to identify new structural limitations.

## III

In the end, the Court's remedy underscores that it is ambivalent about the idea of administrative patent judges *actually* being principal officers. Instead of holding as much explicitly, the Court rewrites the statutory text to ensure that the Director can directly review Board decisions. *Ante*, at 21–22 (plurality opinion). Specifically, the Court declares unenforceable the statutory provision that "prevents the Director from reviewing the decisions of the [Board] on his own." *Ante*, at 22. And as a remedy, the Court "remand[s] to the Acting Director for him to decide whether to rehear the petition." *Ibid.* In that way, the Court makes extra clear what should already be obvious: Administrative patent judges are inferior officers.

But neither reading of the majority's opinion—(1) that administrative patent judges are principal officers that the Court has converted to inferior officers, or (2) that administrative patent judges are inferior officers whose decisions must constitutionally be reversible by the Director alone—supports its proposed remedy.

Take the principal officer view. If the Court truly believed administrative patent judges are principal officers, then the Court would need to vacate the Board's decision. As this Court has twice explained, "the 'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official." *Lucia*, 585 U. S., at ___ (slip op., at 12) (quoting *Ryder* v. *United States*, 515 U. S. 177, 183, 188 (1995)). If administrative patent judges are (or were) constitutionally deficient principal officers, then surely Arthrex is entitled to a new hearing before officers untainted by an appointments

violation. But, the Court does not vacate the Board's decision. In fact, it expressly disavows the existence of an appointments violation. *Ante*, at 23 (plurality opinion).

The quasi-separation-of-powers view fares no better. If we accept as true the Court's position that the Appointments Clause inherently grants the Director power to reverse Board decisions, then another problem arises: No constitutional violation has occurred in this suit. The Board had the power to decide and lawfully did decide the dispute before it. The Board did not misinterpret its statutory authority or try to prevent direct review by the Director. Nor did the Director wrongfully decline to rehear the Board's decision. Moreover, Arthrex has not argued that it sought review by the Director. So to the extent "the source of the constitutional violation is the restraint on the review authority of the Director," *ibid.*, his review was not constrained. Without any constitutional violation in this suit to correct, one wonders how the Court has the power to issue a remedy. See *Carney* v. *Adams*, 592 U. S. ___, ___ (2020) (slip op., at 4) (Article III prevents "the federal courts from issuing advisory opinions").

Perhaps the majority thinks Arthrex should receive some kind of bounty for raising an Appointments Clause challenge and *almost* identifying a constitutional violation. But the Constitution allows us to award judgments, not participation trophies.

IV

Although unnecessary to resolve this suit, at some point it may be worth taking a closer look at whether the functional element of our test in *Edmond*—the part that the Court relies on today—aligns with the text, history, and structure of the Constitution. The founding era history surrounding the Inferior Officer Clause points to at least three different definitions of an inferior officer, none of which requires a case-by-case functional examination of exactly how

much supervision and control another officer has.  The rationales on which *Edmond* relies to graft a functional element into the inferior-officer inquiry do not withstand close scrutiny.

## A

Early discussions of inferior officers reflect at least three understandings of who these officers were—and who they were not—under the Appointments Clause.  Though I do not purport to decide today which is best, it is worth noting that administrative patent judges would be inferior under each.

### 1

The narrowest understanding divides all executive officers into three categories: heads of departments, superior officers, and inferior officers.  During the Constitutional Convention, James Madison supported this view in a brief discussion about the addition of the Inferior Officer Clause. 2 Records of the Federal Convention of 1787, p. 627 (M. Farrand ed. 1911) (Farrand); see also Mascott, Who Are "Officers of the United States," 70 Stan. L. Rev. 443, 468, n. 131 (2018).  Gouverneur Morris moved to add the clause.  But Madison initially resisted.  He argued that it did "not go far enough if it be necessary at all [because] Superior Officers below Heads of Departments ought in some cases to have the appointment of the lesser offices."  2 Farrand 627.  The motion nonetheless passed.  The crux of Madison's objection appears to rely on the idea that there are three types of officers: inferior officers, superior officers, and department heads.  Congress could vest the appointment of inferior officers in the President, the courts, or a department head.  But the others must be appointed by the President with Senate confirmation.

Some held a second understanding: Inferior officers encompass nearly *all* officers.  As Justice Story put it,

"[w]hether the *heads of departments* are inferior officers in the sense of the constitution, was much discussed, in the debate on the organization of the department of foreign affairs, in 1789." 3 Commentaries on the Constitution of the United States 386, n. 1 (1833) (emphasis added). Proponents of this understanding argued that the Secretary of State should be an inferior officer because he was inferior to the President, "the Executive head of the department." 1 Annals of Cong. 509. In other words, inferior officers would encompass *all* executive officers inferior to the President, other than those specifically identified in the Constitution: "Ambassadors, other public Ministers and Consuls." Art. II, §2.

The constitutional text and history provide some support for this rationale. By using the adjective "such" before "inferior Officers," the Clause about inferior officers could be understood to refer back to "all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." *Ibid.*; see also 2 S. Johnson, A Dictionary of the English Language (6th ed. 1785) (defining "such" to mean "[c]omprehended under the term premised, like what has been said"). And to be "inferiour" means simply to be "[l]ower in place"; "[l]ower in station or rank of life" and "[s]ubordinate" to another officer. 1 *ibid.* Department heads are officers, and they are lower in rank and subordinate to the President. See U. S. Const., Art. II, §1.

But others disagreed, contending this went "too far; because the Constitution" elsewhere specifies "'the principal officer in each of the Executive departments.'" 1 Annals of Cong. 459. These Framers endorsed a third understanding, which distinguished just between inferior and principal officers. See *id.*, at 518 ("We are to have a Secretary for Foreign Affairs, another for War, and another for the Treasury; now, are not these the principal officers in those departments"). A single officer could not simultaneously be both.

Ultimately, this group won out, "expressly designat[ing]" the Secretary of the Department of Foreign Affairs as a "principal officer," not an inferior one. *Edmond*, 520 U. S., at 663 (quoting Act of July 27, 1789, ch. 4, §§1–2, 1 Stat. 28–29).

This principal-inferior dichotomy also finds roots in the structure of the Constitution, which specifically identifies both principal officers (in the Opinions Clause and the Twenty-fifth Amendment) and inferior officers (in the Appointments Clause). And it comports with contemporaneous dictionary definitions. A "principal" officer is "[a] head" officer; "a chief; not a second." 2 Johnson, Dictionary of the English Language. Other executive officers would, by definition, be lower than or subordinate to these head officers.

The principal-inferior officer divide played out in other contexts as well. In the debate over removability of officers, Representative Smith indicated that he "had doubts whether [an] officer could be removed by the President" in light of the impeachment process. 1 Annals of Cong. 372. Madison disagreed, arguing that impeachment alone for all removals "would in effect establish every officer of the Government on the firm tenure of good behaviour; not the heads of Departments only, but all the inferior officers of those Departments, would hold their offices during good behaviour." *Ibid.*

State constitutions at the founding lend credence to this idea that inferior officers encompass all officers except for the heads of departments. For example, the 1789 Georgia State Constitution provided that "militia officers and the secretaries of the governor . . . shall be appointed by the governor." Art. IV, §2. But "[t]he general assembly may vest the appointment of inferior officers in the governor, the courts of justice, or in such other manner as they may by law establish." *Ibid.* The law thus distinguished between secretaries and inferior officers. Similarly, the Delaware Constitution directed that "[t]he State treasurer shall be

appointed annually by the house of representatives, with the concurrence of the Senate." Art. VIII, §3 (1792). But "all inferior officers in the treasury department" were to be "appointed in such manner as is or may be directed by law." §6.

Although not dipositive, this Court has adopted the nomenclature of the principal-inferior distinction. See, *e.g.*, *ante,* at 5–6; *Edmond*, 520 U. S., at 661 ("distinguishing between principal and inferior officers for Appointments Clause purposes"); *Buckley* v. *Valeo*, 424 U. S. 1, 132 (1976) (*per curiam*) ("Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary"); cf. *Lucia*, 585 U. S., at \_\_\_ (THOMAS, J., concurring) (slip op., at 2) ("While principal officers must be nominated by the President and confirmed by the Senate, Congress can authorize the appointment of 'inferior Officers' by 'the President alone,' 'the Courts of Law,' or 'the Heads of Departments'"); *United States* v. *Germaine*, 99 U. S. 508, 511 (1879) ("the principal officer in" the Opinions Clause "is the equivalent of the head of department in the other"). And in reasoning adopted unanimously by the Court, at least one opinion defined "principal officers" for purposes of the Appointments Clause to be "ambassadors, ministers, heads of departments, and judges." *Freytag* v. *Commissioner*, 501 U. S. 868, 884 (1991).

2

Regardless of which of the three interpretations is correct, all lead to the same result here. Administrative patent judges are inferior officers.

Start with the broadest understanding. A careful read of the Appointments Clause reveals that the office of "administrative patent judge" does not appear amidst the offices of ambassador, consul, public minister, and Supreme Court

judge the Constitution identifies. See Art. II, §2, cl. 2. So, if inferior officers are all executive officers other than those with special appointment processes laid out in the Constitution, then administrative patent judges squarely fit.

Administrative patent judges also fall on the inferior-officer side of the inferior-principal divide. It is agreed that administrative patent judges are not the heads of any department. See *ante*, at 8; Brief for Arthrex, Inc., 5–6 (noting that the Secretary of Commerce is the relevant "department head"). Thus, to the extent a "principal officer . . . is the equivalent of the head of department," administrative patent judges are not one. *Germaine*, 99 U. S., at 511.

And under the Madisonian tripartite system, administrative patent judges would still be inferior. These judges are not heads of departments. Nor are they "superior officers." An administrative patent judge is not "[h]igher" than or "greater in dignity or excellence" to other officers inferior to him. 2 Johnson, Dictionary of the English Language (defining "Superiour"). Tellingly, neither respondent nor the majority identify a *single* officer lower in rank or subordinate to administrative patent judges. Surely if "[w]hether one is an 'inferior' officer depends on whether he has a superior," then whether one is a superior officer depends on whether he has an inferior. *Edmond*, 520 U. S., at 662; see also *Morrison*, 487 U. S., at 720 (Scalia, J., dissenting) ("Of course one is not a 'superior officer' without some supervisory responsibility"). In contrast, an administrative patent judge *is* lower in rank and subordinate to both the Director and the Secretary.

\*     \*     \*

To be clear, I do not purport to have exhausted all contemporaneous debates, sources, and writings. Perhaps there is some reason to believe that the inherent nature of an inferior officer requires that all of their decisions be directly appealable to a Senate-confirmed executive officer.

But the majority does not identify one. And, without any justification in the text, in the history, or in our precedent, I would not impose that requirement.

B

If anything, the Court's functional prong in *Edmond* may merit reconsideration. The *Edmond* opinion highlighted three justifications for its decision to require more than just a lower rank and a superior officer. But having reviewed the history, it is worth checking whether these reasons are sound. They may not be.

First, *Edmond* highlighted the Constitution's use of the term "inferior officer." 520 U. S., at 663. Were the Appointments Clause meant to identify only lower ranking officers, then the Constitution could have used the phrase "'lesser officer.'" *Ibid*. But Madison's objection to the Inferior Officer Clause pokes a hole in this distinction. After all, Madison used almost exactly this "lesser officer" phrasing: He urged a broader clause so that "superior officers" could "have the appointment of the *lesser offices*." 2 Farrand 627 (emphasis added). If Madison understood the two terms to be interchangeable, perhaps this Court should too.

Second, *Edmond* flagged that the Appointments Clause was designed "to preserve political accountability relative to important Government assignments." 520 U. S., at 663. But the accountability feature of the Appointments Clause was not about accountability for specific *decisions* made by inferior officers, but rather accountability for "'a bad nomination.'" *Id*., at 660 (quoting The Federalist No. 77, p. 392 (M. Beloff ed. 1987)). The Appointments Clause "provides a direct line of accountability for any poorly performing *officers* back to the actor who selected them." Mascott, 70 Stan. L. Rev., at 447 (emphasis added).

And third, *Edmond* noted that legislation adopted by early Congresses revealed that inferior officers were subject to the discretion and direct oversight of the principal officer.

520 U. S., at 663.  Take, for example, the Act establishing the Department of War: It referred "to the Secretary of that department as a 'principal officer,'" and provided that "the Chief Clerk, would be 'employed' within the Department as the Secretary 'shall deem proper,' as an 'inferior officer.'" *Edmond*, 520 U. S., at 664 (quoting ch. 7, 1 Stat. 49–50).

But not every officer was neatly categorized as a principal officer or an inferior one.  For example, the Act of Congress Establishing the Treasury Department created "the following officers, namely: a Secretary of the Treasury, to be deemed head of the department; a Comptroller . . . , and an Assistant to the Secretary of the Treasury, which assistant shall be appointed by the said Secretary."  Act of Sept. 2, 1789, ch. 12, §1, 1 Stat. 65.  The statute does not label the Comptroller as a principal officer or a department head. Nor is he expressly designated as an inferior officer.  Moreover, his duties extended beyond doing merely what the Secretary deemed proper.  The Comptroller's statutory power and authority included "countersign[ing] all warrants drawn by the Secretary of Treasury," "provid[ing] for the regular and punctual payment of all monies which may be collected," and "direct[ing] prosecutions for all delinquencies of officers of the revenue, and for debts that are, or shall be due to the United States."  §3, *id.,* at 66.  This quasi-judicial figure's "principal duty seems to be deciding upon the lawfulness and justice of the claims and accounts subsisting between the United States and particular citizens."  1 Annals of Cong. 611–612 (Madison); see also *ante*, at 14–15.  Yet at least one early legislator (with no recorded objections) thought "the Comptroller was an inferior officer."  1 Annals of Cong. 613 (Stone).

Given the lack of historical support, it is curious that the Court has decided to expand *Edmond*'s "functional" prong to elevate administrative patent judges to principal-officer status (only to demote them back to inferior-officer status). Perhaps the Court fears that a more formal interpretation

might be too easy to subvert. A tricky Congress could allow the Executive to sneak a powerful, Cabinet-level-like officer past the Senate by merely giving him a low rank. Maybe. But this seems like an odd case to address that concern. And, even if this suit did raise the issue, the Court should be hesitant to enforce its view of the Constitution's spirit at the cost of its text.

\*    \*    \*

The Court today draws a new line dividing inferior officers from principal ones. The fact that this line places administrative patent judges on the side of Ambassadors, Supreme Court Justices, and department heads suggests that something is not quite right. At some point, we should take stock of our precedent to see if it aligns with the Appointments Clause's original meaning. But, for now, we must apply the test we have. And, under that test, administrative patent judges are both formally and functionally inferior to the Director and to the Secretary. I respectfully dissent.